**In re HOLIDAY MART, INC., Bankrupt.**

**Bankruptcy No. 77–00565.**

United States Bankruptcy Court,
D. Hawaii.

March 5, 1982.

Gregory Conlan, Honolulu, Hawaii, for Trustee.

John Moon, Honolulu, Hawaii, for Peter Hsi.

## FINDINGS OF FACT; CONCLUSIONS OF LAW; AND ORDER DISALLOWING PROOF OF CLAIM OF PETER HSI ASSOCIATES, INC.

JON J. CHINEN, Bankruptcy Judge.

On May 8, 1981, Peter Hsi Associates, Inc., hereafter "Claimant", filed herein its proof of claim in the amount of $46,535.36 for alleged services rendered on behalf of the estate. On May 15, 1981, Honolulu Professional Services, Ltd., Trustee of Holiday Mart, Inc., hereafter "Trustee", filed an Objection to Claim filed by Claimant. Hearings on the matter were held on June 25, 1981 and July 7, 1981.

Based upon the evidence adduced, the memoranda and records herein and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. On December 30, 1977, Holiday Mart, Inc., hereafter "Holiday Mart", filed a Chapter XI bankruptcy proceeding.

2. Edwin K. Q. Yee is, and at all times relevant herein was, the President of Holiday Mart. From December 30, 1977 until August 3, 1978, Holiday Mart was a debtor-in-possession and Mr. Yee acted as the principal officer. In that capacity, Mr. Yee conducted the business of Holiday Mart in the same fashion as he had before the filing of the bankruptcy petition.

3. On August 3, 1977, Thomas E. Hayes was appointed as the Receiver of Holiday Mart. Mr. Hayes acted as Receiver of Holiday Mart from August 3, 1978 until December 5, 1980, at which time he was replaced as Receiver by Honolulu Professional Services, Ltd., which subsequently became Trustee herein.

4. When Mr. Hayes was appointed as Receiver, Mr. Yee lost all power to represent Holiday Mart and he was required to relocate his office from Kaheka Street to Kalakaua Avenue.

5. After his appointment as Receiver, Mr. Hayes was directed by the Holiday Mart creditors to explore the development potential of the Holiday Mart properties.

6. In the fall of 1978, the estate had no monies available to fund a development project. This was known to Mr. Yee.

7. Some time in the fall of 1978, Mr. Hayes met with Jo Paul Rognstad with respect to the possible development of the Kaheka Street site. Mr. Rognstad made a proposal to Mr. Hayes with respect to such development which provided that the estate would not be required to expend any money.

8. When Mr. Yee, Mr. Hayes and Mr. Rognstad met to discuss Mr. Rognstad's proposal, Mr. Yee suggested some changes to the proposed development of the Holiday Mart property on Kaheka Street. Mr. Rognstad refused, at which time Mr. Yee informed Mr. Hayes that he (Mr. Yee) could not work with Mr. Rognstad. Thereafter, Mr. Hayes suggested that Mr. Yee look into the matter of developing the said property.

9. In the fall of 1978, Mr. Yee, as president of the Debtor, was attempting to formulate a plan of arrangement.

10. Sometime prior to January 3, 1979, Mr. Yee met with Peter Hsi, president of Claimant, with respect to Claimant acting as architect on a proposed development of the Kaheka Street site. Commencing on or about January 3, 1979, Claimant began to work on the project. Mr. Hsi and Mr. Yee have had business dealings in the past.

11. On or about January 9, 1979, Mr. Yee met with Paul Banks, president of Hawaiian Dredging & Construction Company, with respect to its acting as the contractor on the proposed development. As of January 9, 1979, Mr. Yee had already selected Claimant as the project architect.

12. On January 16, 1981, Claimant sent Mr. Yee a letter which set forth the work which it proposed to perform. The letter read in part as follows:

> We understand that this proposed development is being undertaken to enable Holiday Mart, Inc. to obtain the funds necessary to pay its creditors. In order to assist you in this regard, we are willing to (a) *fund any preliminary cost to perform the above services and* (b) perform said services for a fee of only 4½% of the contract price, a fee which is substantially lower than normal architectural fees for a project of this type. *Your first payment to me will occur on your initial draw from your construction lender.* (Emphasis added).

13. Claimant and Mr. Yee acknowledged that under the terms of the January 16, 1979 letter, Claimant was not entitled to payment if the project did not go forward and there was not a first draw from a construction lender.

14. On or about January 24, 1979, Mr. Yee sent Mr. Hayes a proposal with respect to the development of the Kaheka Street property. Mr. Yee's letter read in part as follows:

> I will:

(a) Select and work with an architect and the necessary engineers (civil, structural, mechanical and electrical) to design the most economical, yet saleable, project possible. *Implicit in my negotiations with these professionals will be their agreement to expect or require no "front-end" money for their work and to await the first construction draw for payment of any of their fees.* (Exhibit 2).

. . . .

4. *Financing*

In addition to utilizing HD&CC's offer of assistance with financing, I will be contacting potential lenders in order to obtain the best possible construction and take-out financing available for the project. *I would also like to emphasize that Holiday Mart, Inc., will not be required to expend any advance monies in connection with this development nor will the company or you, as Receiver, be exposed to any liability in connection therewith. Our mutual goal, of course, is to see that all the Mart's creditors are made whole, . . ., with no further risks or financial obligations to the company.*

. . . .

8. *Project Control*

As you can well appreciate, I have a vital and vested interest in seeing that the proposed project is successfully completed and I would expect to work closely with you throughout the development. I believe it would be appropriate for us to enter into a written agreement for me to act as project manager/consultant for the project. This would justify my negotiations with the various entities mentioned about. *An integral part of this agreement would, of course, be the non-responsibility of yourself or of Holiday Mart for any of the costs to be incurred through my efforts.* I think you will agree that this request is not unreasonable. (Emphasis added).

15. In response to Mr. Yee's proposal, and in reliance on the representations contained therein, Mr. Hayes sent Mr. Yee a letter dated February 1, 1979, in which he expressed a tentative receptiveness to the idea and asked for further details with respect to, among other things, the architectural envelope. Mr. Hayes felt that Mr. Yee's letter together with Mr. Hsi's letter attached thereto, assured him that there would be no out-of-pocket costs to the estate for the project.

16. Subsequent to February 1, 1979, Mr. Yee submitted a development agreement to Mr. Hayes; however, it was never executed because the project never proceeded beyond the preliminary stages.

17. Mr. Yee undertook various tasks in furtherance of his proposal after February 1, 1979. Specifically, he met with a number of the lessors of the property upon which the project was to be situated. He also met with officials from the City with respect to obtaining a change in zoning for the property and to acquiring Poni Street.

18. From time to time, Mr. Hayes wrote letters to the City and other individuals indicating that Mr. Yee had authority to negotiate on behalf of the estate with respect to a change in zoning and land consolidation. Mr. Hayes allowed Mr. Yee to enter into these negotiations because of his feeling that Mr. Yee had better political connections and also to allow him to test the feasibility of the project. In conjunction with testing the feasibility of the project, Mr. Hayes also paid certain fees with respect to the zoning changes and land consolidation. With respect to the fees paid to R. M. Towill Corporation and Motoomi and Associates, Inc., Mr. Yee called Mr. Hayes stating that they wanted money up-front and Mr. Hayes did pay them between $2,000.00 to $3,000.00 each. The City was paid $500.00 as an application fee. As for Mr. Au's fee, it was paid by Dai'ei. All of these matters were handled on a case-by-case basis and at no time did Mr. Hayes grant Mr. Yee general authority to deal on behalf of the estate with respect to the project.

19. Commencing in early 1979, the creditors of Holiday Mart began to exert pressure for the filing of a plan of arrangement. In response, Mr. Yee from time to time advised the Court, both at hearings and through the reports filed by the Receiver, of his activities with respect to the develop-

ment which was known as the Kalakaua Square project.

20. Commencing on or about January 3, 1979, Claimant engaged in various architectural services with respect to the development. This included the preparation of renderings and other architectural drawings. Mr. Hsi has testified that Exhibit C, attached to the Proof of Claim filed herein, accurately represents the time spent on the Kalakaua Square project between January 3, 1979 and October 23, 1979.

21. Mr. Hsi testified that approximately 35% of the architectural work had been completed at the time Claimant stopped working on the project.

22. At no time between January 3, 1979 and October 23, 1979, did Mr. Hayes have any contact with Mr. Hsi or anyone associated with Claimant.

23. Sometime subsequent to January 24, 1979, Mr. Hsi met with Mr. Yee and inquired as to how Claimant would be paid if the project did not go through. Mr. Yee, without consulting Mr. Hayes, the creditors of Holiday Mart or this Court, advised Mr. Hsi that in the event the project did not go through, Claimant would be paid by the estate for the time spent by its personnel at their normal hourly rate. This agreement between Mr. Hsi and Mr. Yee was never reduced to writing. Mr. Yee never advised Mr. Hayes of this agreement nor of the facts that the January 24, 1979 proposal had been modified.

24. The project was abandoned because of the sale of the Holiday Mart stores to Dai'ei. As a result, there was no construction loan from which Claimant could be paid pursuant to the terms of the January 16, 1979 letter.

25. On February 12, 1980, Claimant sent Mr. Yee an invoice seeking to be paid for the time its personnel had spent on the project at their normal hourly rate.

26. Mr. Hayes did not receive a copy of this invoice until April, 1981 when payment was first demanded from the estate.

27. Claimant did not receive authority of this Court to render services to the estate.

28. These Findings of Fact, insofar as they are Conclusions of Law, are incorporated by reference in the Conclusions of Law as hereinafter stated.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties hereto and over the subject matter of this proceeding.

2. The burden of establishing entitlement to this claim is on Claimant.

3. At all times relevant hereto, Mr. Hayes was the only person authorized to enter into agreements which would be binding on the estate.

4. At no time did Mr. Hayes authorize Mr. Yee to act as his agent or as the agent of the estate for the purpose of employing Claimant.

5. Any specific authorization which Mr. Hayes may have given to Mr. Yee with respect to testing the feasibility of the development did not constitute a general authorization of Mr. Yee to act on behalf of the estate with respect to the development.

6. In a Chapter XI proceeding the debtor has the duty of proposing a plan of arrangement. Neither the receiver nor the estate has any duty with respect to formulating a plan of arrangement.

7. The activities undertaken by Mr. Yee with respect to the project were in furtherance of the Debtor's plan of arrangement.

8. In the January 16, 1979 letter sent to Mr. Yee by Mr. Hsi, it clearly stated that Claimant was willing to "fund any preliminary cost to perform the above (architectural) services. . . . Your first payment to me will occur on your initial draw from your construction lender."

9. Said letter clearly showed that Claimant was to bear all preliminary costs of the architectural services and that it would be paid upon the first draw from the construction loan. Since there was no construction loan, Claimant is not entitled to payment.

10. The modification of the January 16, 1979 letter which has been testified to by Mr. Hsi and Mr. Yee, to permit Claimant to

be paid at its normal hourly rates for time spent in the event the project did not go forward, is not binding on the estate. Mr. Yee had no authority to enter into such an agreement on behalf of the estate, and Mr. Hsi and Mr. Yee failed to obtain the approval of Mr. Hayes of this modification.

11. In addition, Claimant's failure to seek or obtain this Court's consent to its fee arrangement with Mr. Yee means that it cannot be paid from the assets of the estate.

12. Mr. Hayes was not under a duty to advise Claimant to stop work on the development.

13. Mr. Hayes acted reasonably and in the best interest of the estate in relying on the representations contained in the January 24, 1979 letter from Mr. Yee, with Claimant's letter of January 16, 1979 attached.

14. The general rule is that, where an entity renders services to the estate without first being authorized by the Court, such entity is not entitled to any compensation from the estate. The rule and reasoning were clearly set forth in *In re Siegel*, 252 F. 197 (S.D.N.Y.1918), *rev'd on other grounds*, 256 F. 226 (2d Cir. 1919), by Judge Learned Hand:

> The court must look to the receiver as the adequate custodian and the sole person who can establish any claims for administration, except such as are otherwise expressly authorized by statute. Any services rendered by those not authorized by the receiver must be deemed to be on the account of the creditors who undertake them. They are merely volunteered, and the estate, even though actually benefited, owes nothing for them. There is no hardship in this, but absolute justice. Any creditor may apply at any time to the court upon suggestion that the receiver should authorize him to assist, and the court can so direct. But to allow claims to be established for benefits, supposititious or actual, without some initial indication the services upon which they are based would be the subject of a charge, is wrong in principle and mischievous in application. An estate in the custody of a court is not in need of voluntary services; there is no room for the doctrine of salvage. It is presumably being cared for adequately, and those who seek to impose upon it the benefit of their assistance do so at their own account, unless they secure some consent at the outset. *Id.* at 198.

15. In the past, this Court has granted compensation to attorneys and real estate brokers who have rendered services to the estate without prior written authorization of the Court. In those cases, however, there was clear evidence that the estate was benefited by the receipt of money which would not have otherwise been received but for the services rendered for which compensation was granted.

16. In the instant case, there was no evidence showing that the efforts of Claimant had increased the value of the estate's assets. Thus, since Claimant was not authorized by this Court to render architectural services, Claimant's Proof of Claim is disallowed.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the proof of claim filed by Peter Hsi Associates, Inc. is disallowed.