In re Elmer D. WERTH, Debtor.

Bankruptcy No. 80 B 03483 M.

United States Bankruptcy Court, D. Colorado.

July 7, 1983.

Paul Rubner, Paul Rubner, P.C., Harold Feder, Feder, Morris & Tamblyn, Denver, Colo., for debtor-in-possession.

David Oppenheim, Office of the U.S. Trustee, James Burghardt, Head, Moye, Giles & O'Keefe, Denver, Colo., for Intra-West Bank of Denver.

William Rutter, Sherman & Howard, Denver, Colo., for 1st Nat. Leasing.

## MEMORANDUM OPINION

JAY L. GUECK, Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to interim applications for fee allowances filed by Paul Rubner, P.C., attorney for the debtor-in-possession, and Harold Feder, of Feder, Morris and Tamblyn, special trial counsel for the debtor-in-possession. Also before the court is an application to retain an expert witness in the field of mortgage banking and finance to assist in connection with continuing litigation in which Elmer Werth, the debtor, is involved.

I. *Attorney's Fees Under the Bankruptcy Code.*

A. *General Discussion.*

Applications for attorney's fees are governed by § 330 of the Bankruptcy Code, which provides as follows:

"(a) After notice to any parties in interest and to the United States Trustee and a hearing, . . . the court may award to . . . a professional person employed under § 327 or § 1103 of this Title, or to the debtor's attorney—

(1) Reasonable compensation for actual, necessary services rendered by such . . . professional person, or attorney, as the case may be, . . . based on the time, the nature, the extent, and the value of such services and the cost of comparable services other than in a case under this Title; . . ."; and

(2) Reimbursement for actual and necessary expenses.

It has been noted that § 330 of the Code marked a distinct departure from earlier practices under the Act, which was more restrictive in its awards of compensation. The court in *In re Penn-Dixie,* 18 B.R. 834 (Bkrtcy.N.Y.1982) stated:

"This liberal standard of compensation marks a sharp cleavage from past practices which tended to preclude many highly qualified practitioners from entering the bankruptcy field. The rationale is clearly set forth in the House Report on § 330: to encourage successful administration of estates by attracting bank-

ruptcy specialists of a high quality." *In re Penn-Dixie, supra,* at page 838.

Bankruptcy Rule 219(c) has directed the court to allow reasonable compensation in awarding attorney's fees by giving "due consideration to the nature, extent, and value of the services rendered, as well as to the conversation of the estate and the interests of creditors." It is further provided in Rule 219(a) that a person seeking compensation for services rendered or for reimbursement of expenses, "shall file with the court an application setting forth a detailed statement of (1) the services rendered and expenses incurred, and (2) the amounts requested." It is noted that proposed bankruptcy Rule 2016, scheduled to supersede old F.R.B. 219 on August 1, 1983, continues to require the same detailed statement but, additionally, requires a statement of time expended.

Both of these rules of bankruptcy procedure are consistent with the provisions of the Code, which, under § 329(a), requires an attorney representing a debtor to file with the court a statement of compensation paid or agreed to be paid.

The burden of proof in all fee matters is on the applicant. *Matter of Liberal Market,* 24 B.R. 653 (Bkrtcy.Ohio 1982); *Matter of Olen,* 15 B.R. 750 (Bkrtcy.Mich. 1981). § 330(a)(1) only allows compensation for those attorney's fees which are "actual and necessary" to the administration of the bankruptcy estate. § 503(b)(2), which classifies the fees awarded as an administrative expense, similarly authorizes reimbursement for "actual and necessary" costs and expenses of preserving the estate. If the fees are awarded pursuant to § 330 and § 503(b)(2), they receive priority treatment under § 507 of the Code.

It is the duty of the bankruptcy court to independently determine the reasonableness of fees charged by professionals against the estate, keeping in mind that the Code permits compensation commensurate with specialists in other fields in order to attract lawyers of high quality and integrity to the practice of bankruptcy law. *Car-*

ter v. Woods, 433 F.Supp. 291 (D.C.Mo. 1977); In re Garland Corp., 8 B.R. 826 (Bkrtcy.Mass.1981).

■ The factors to be utilized in determining whether the fees requested are reasonable under § 330, in addition to those referred to in F.R.B. 219(c), are set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) and adopted in this circuit in In The Matter of Permian Anchol Services, Inc., 649 F.2d 763 (10 Cir. 1981). These elements are: (1) The time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the locality for similar legal services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys involved; (10) the nature and length of the professional relationship with the client; and (11) the "undesirability" of the case. It is noted that these factors are exactly the same as those promulgated in the Code of Professional Responsibility at DR 2–106, except that the "undesirability" of the case is an additional element adopted in bankruptcy litigation.

These factors are to be utilized to aid the court in scrutinizing fees for their reasonableness "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this Title." 11 U.S.C. § 330(a)(1).

■ One who acts as general counsel for the debtor is charged with the responsibility of keeping costs to the estate at a minimum. Arlan's Dept. Stores, Inc., 462 F.Supp. 1255 (D.C.N.Y.1978). The fees should be carefully reviewed in light of the guidelines enumerated above, with an eye toward eliminating excessive hourly charges, Matter of R.C. Sanders Technology Systems, Inc., 21 B.R. 40 (Bkrtcy.N.H.1982); anticipated future legal services, Matter of

Liberal Market, supra; duplication of compensation for duplication of effort, Cle-Ware, Inc. v. Sokolsky, 493 F.2d 863 (6th Cir.1974); non-legal services rendered in connection with the operation of the debtor's business, 11 U.S.C. § 328(b), Matter of Braswell Motor Freight Lines, 630 F.2d 348 (5th Cir.1980); and expert compensation for mundane tasks or routine court appearances, Matter of Liberal Market, supra.

■ The fee application should be specific, as it is the duty of the attorney to maintain and submit detailed time records, In re Meade, 577 F.2d 858 (3rd Cir.1978). The application should be specific enough to enable the court to "identify the legal problems involved, the difficulty of the problems, how the problem was resolved and what results were achieved for the estate." In re Lafayette Radio Electronics Corp., 16 B.R. 360 (Bkrtcy.N.Y.1982), at page 361; F.R.B. 219(a).

A useful example of a detailed fee application is found in In re Nation/Ruskin, Inc., 22 B.R. 207 (Bkrtcy.E.D.Pa.1982). The application there contains the date, the attorney who handled the matter, a detailed description of the subject matter and the time expended. With respect to the authority of the bankruptcy court over these matters, the court ruled, "[T]he determination of the adequacy of records prepared by counsel in applications for allowances is left to the court, and where deemed necessary, a bankruptcy judge is free to require an attorney to produce additional evidence in order to substantiate the legal character of items set forth in the application." In re Nation/Ruskin, at page 209.

B. Interim Allowances. Under the old Bankruptcy Act, there was a question as to whether interim fee allowances were proper. However, § 331 of the Bankruptcy Code specifically authorizes interim compensation based on the standards promulgated in § 330. In Vol. 2 of Collier on Bankruptcy, 15th Ed., § 331.03, pages 331–6, the authors state:

"The amount of interim compensation which may be allowed is to be reasonable,

for actual, necessary services rendered, and based on the time, the nature, the extent and the value of the services rendered, and the cost of comparable services other than in a case under the Code .... Thus, a court may allow interim compensation under § 331 in an amount equal to the actual services rendered by the applicant prior to the date of the fee request, i.e., full compensation. This would include compensating attorneys and other professional persons at the full value of the professional services rendered so long as the interim compensation allowed otherwise comports with the requirements of § 330."

It has been said that the purpose of interim compensation is to "relieve the economic burden on counsel" for the debtor. *Matter of Mansfield Tire & Rubber,* 19 B.R. 125, 127 (Bankr.Ohio 1981).

 Decisions in this area have uniformly rejected two arguments advanced in this proceeding by creditors and the trustee. These objectors contend that an interim award to Paul Rubner, P.C. should be withheld pending confirmation of a plan of reorganization, and an award to Harold Feder should be withheld pending resolution of the estate litigation.

Many cases have rejected the contention that a confirmed plan is a pre-condition to an award of interim fees. *In re International Horizons,* 10 B.R. 895 (Bkrtcy.Ga. 1981); *In re Western Farmers' Association,* 8 B.R. 539 (Bkrtcy.Wash.1981); and *In re Quick Release, Inc.,* 6 B.R. 713 (Bkrtcy.S.D. 1980). The rationale for such rejection was aptly stated in the case of *In re Quick Release, supra,* at page 715, where the court indicated:

"This court is aware that bankruptcy cases, especially Chapter 11 reorganization cases, can last years before they are closed. The approach suggested by Kirkwood, would, in effect, require counsel for a debtor to finance the case until its conclusion or (2) require such a large deposit or retainer fee that the effect would be prohibitive on potential debtors. The language of § 331 and the Legislative History suggests that it was Congress' intent to achieve just the opposite."

The same reasoning would apply to interim fees requested by Mr. Feder, the special trial counsel who conducted objection to claim proceedings, as well as certain other litigation. The objectors contend that until a decision is made resolving the estate litigation, the results achieved and the resultant benefit to the estate cannot be determined. This position lacks merit for several reasons. First, trial counsel cannot be expected to finance the litigation any more than the bankruptcy attorney should be expected to finance attorney's fees for a reorganization. Secondly, benefit, or value, to the estate is not determined simply by whether the litigation is won or lost. Counsel may perform very ably and, yet, not achieve the desired results. The estate is benefitted by being well represented through an efficient, well-reasoned and professional presentation of its position in litigation. Thirdly, "the results obtained" is only one of many elements to be reviewed. See, *Johnson v. Georgia Highway Express, Inc., supra.* To emphasize this element, while de-emphasizing the remainder, would result in a contingent fee subject to being capped at the hourly rate for a successful result but a reduction of that rate if the debtor failed to prevail in the litigation. This is neither fair nor does it comport with Congressional intent as reflected in the Code and its Legislative History. The parties must remember that the fees sought in this application are merely interim fees. When final fees are requested, the court has authority to fashion the final award in an equitable manner, considering the amount of fees already awarded. Further, at that time, when the results of pending litigation are known, an adjustment can be made upward or downward in the final fees to account for results. In this regard, it is clear that the court has authority to award compensation beyond hourly rates and to give a premium for exceptional services rendered by debtor's counsel for a successful reorganization. *In re Warrior Drilling and Engineering Co., Inc.,* 18 B.R. 684 (D.C.

Ala.1981). The same would hold true with respect to an outstanding result in litigation. Conversely, the foregoing authority would also allow the court to reduce the fees requested if they appear exorbitant, considering the results achieved and all other attendant elements previously discussed herein.

## II. *Factual Background.*

Elmer Werth is a Vice-President for Coors, Inc. He had an extensive financial empire which included interests in Fairview Farms, H & R Farms, Elmar Enterprises, Tempo Investment Co., Appletree Associates, and the Don/Mark Partnership. At this point a disclosure statement and two plans of reorganization are on file for his individual bankruptcy. It is evident that considerable time and preparation went into the two alternative plans and the disclosure statement. Hearings have been held with respect to the adequacy of the disclosure statement and orders have been entered thereon. Further services have been and will be necessary to conform to such orders.

Werth has three large matters in litigation in this and other courts. He has objected to Claim No. 39 of IntraWest Bank of Denver, and has indicated an intention to sue IntraWest for damages in an adversary proceeding. He has a lawsuit filed in state court for damages against Eaton Land and Cattle Co., et al. The objection to Claim No. 39 was the subject of extensive litigation in this court in April, 1983. Extensive preparation was necessary for both sides, to include factual investigation, discovery, the assemblage of evidence and preparation of various trial and post-trial briefs, which will be of considerable assistance to this court in arriving at a resolution. The other matters are pending in this and other courts.

In his Plans of Reorganization, Mr. Werth plans to sell most of the real property he owns. One Plan provides for the retention, by the estate, of the remaining pieces of litigation. The other Plan abandons the litigation to Werth individually. A determination has not yet been made as to which Plan the creditors prefer. However, the Chapter 11 case was filed in 1980 and finally appears to be approaching a hearing to confirm one Plan or another. Various applications for attorney's fees by other counsel have been filed. Some have been the subject of objection. Some have not. Orders have been entered with respect to all other attorney's fees except those addressed in this opinion.

## III. *Attorney's Fees Applications.*

### A. *Paul Rubner, P.C.*

Paul Rubner, P.C. has been the attorney for the debtor if the Don/Mark, Elmar and Elmer Werth bankruptcies. The fees and costs requested are as follows:

| MATTER | ATTORNEY'S FEES | COSTS | TOTAL |
|---|---|---|---|
| 1. Elmer Werth Matter | $ 17,214.50 | $ 278.32 | $ 17,492.82 |
| 2. Don/Mark Bankruptcy | 2,556.50 | 108.20 | 2,664.70 |
| 3. Elmar Enterprises Bankruptcy | 1,570.50 | 90.50 | 1,661.00 |

There has been no objection to the application for fees in the Don/Mark or Elmar Enterprises bankruptcies.

This court has awarded Paul Rubner, P.C. interim fees and costs incurred in connection with the Elmer Werth bankruptcy on three occasions: June 5, 1981, October 13, 1981 and April 2, 1982. The last application for interim fees and costs was made on March 11, 1982. The date of this application is December 6, 1982. Thus, it is more than 120 days after the preceding application, and is timely pursuant to § 331 of the Code.

After a painstaking review of Rubner's application for interim allowance of attorney's fees, I conclude they are to be awarded as requested in the application.

The objectors first contend that Rubner should not be reimbursed for time spent briefing Mr. Feder to better familiarize him with this forum and the practice and procedure in the bankruptcy courts. They also argue, as noted above, that an award of fees would be premature since a Plan has not yet been confirmed. Finally, they object to compensating Rubner for time spent investigating possible claims of the debtor because in one of the filed Plans of Reorganization the debtor offers to have the estate abandon damage recovery litigation to himself.

With respect to Rubner's assistance to Mr. Feder, it is my conclusion that the charges are justified. An examination of the application reveals that approximately 15 hours were spent by Paul Rubner, P.C. in this endeavor. These efforts were necessary in light of the technical and often contradictory Bankruptcy Rules and Code provisions, the novelty of the Code and the God-only-knows jurisdictional status of the bankruptcy court system. The retention of an experienced, highly qualified advocate to pursue substantive litigation on behalf of the estate would be rendered ineffectual if he could not receive the assistance and expertise of the bankruptcy specialist in preparing the litigation. Bankruptcy counsel should expect to be paid for that assistance. It is doubtful that bankruptcy counsel for the creditors has not already been paid for its assistance to any special trial counsel employed by the creditors. Debtor's counsel should be treated likewise.

Secondly, the argument that the fees should be withheld pending a confirmed Plan has previously been addressed herein. The estates of Elmar Enterprises and Don/Mark do, indeed, have confirmed Plans. While the Elmer Werth estate does not yet have a confirmed Plan, it is noted that two alternate Plans have been on file for inspection for quite some time.

Thirdly, it is my determination that Rubner should be compensated for the background factual investigation in connection with the objection to claim and damage recovery litigation. However, it is necessary to fashion an Order that will address the circumstance presented if the Plan is adopted which abandons litigation to Elmer Werth personally. The gravamen of the objection is that the estate should not finance litigation that will not inure to the benefit of the estate. However, the objecting parties only point to paragraph 4 in the supplement No. 1 to the application as an example of time spent by Rubner on claims which may be abandoned to Werth personally. In this regard, it should be pointed out that much of the time expended was to brief Feder on bankruptcy practice. Additionally, the factual investigation involved therein was necessary to understand the complex financial dealings which lead to the necessity to seek relief under Chapter 11 in August of 1980. It would appear that most of this was spent on behalf of the estate. The objection to the claim of IntraWest Bank, and the affirmative damage-recovery litigation against IntraWest Bank, and Eaton Land and Cattle Co. II, et al, came from the same nucleus of operative facts. In supplement No. 1, Item 17 lists 1.8 hours spent conducting a deposition in order to investigate possible claims against the Denver Gold and Silver Exchange. Certainly, when this time was expended it was accomplished on behalf of the estate. I will allow those fees at this time, but if the Plan which abandons litigation to Werth is adopted, it would be appropriate to entertain a motion to reduce any future fee award by the amount now awarded which is ultimately determined to be attributable to the benefit of Werth personally.

Having concluded that the three major objections are not persuasive, I turn to a review of the reasonableness of Rubner's fees under the guidelines of § 330 and *Permian Anchol, supra.* As stated above, there were no objections to the application for fees in the Don/Mark and Elmar Enterprises bankruptcies. The charges in these cases were largely for winding up the affairs of those reorganizations. The amount charged and time spent there were reasonable and the results achieved commendable.

Elmer Werth kept no books and records and was not well informed on his financial affairs. The attorneys for the debtor-in-possession have been required to shape the estate into a manageable entity. The major areas of activity in which Rubner was engaged during this particular period of time involved conferences with creditors of the debtor regarding claims and documentation, attendance at § 341 meetings, efforts to sell a parcel of property located at 52nd and Union Boulevard, Arvada, Colorado, efforts to sell a parcel of property located at 73rd and Sheridan and water rights thereto, efforts to sell a parcel of property known as the E/Hart quarter, preparation and drafting of a Disclosure Statement and Plans of Reorganization and efforts to collect a judgment owing to the debtor.

■ It appears that a high degree of skill and expertise in bankruptcy was required to perform these services. It is obvious that other employment was precluded by accepting this matter. The results obtained have certainly been favorable. The hourly fee is reasonable and commensurate with the charges for similar services in this community. The fee was also commensurate with his other fees in Don/Mark and Elmar, to which the creditors did not object. No evidence has been presented which would indicate the activities for which compensation is sought are duplicative or routine. Although Mr. Rubner charges $125.00 per hour for his time, the weighted hourly charge for this application is $79.69 per hour. This appears reasonable. Further, the Elmer Werth bankruptcy did present certain novel legal questions. Indeed, as this court is well aware, at least four or five legal opinions will have issued in the course of this proceeding.

Based on the applicable law and the foregoing analysis, I hereby award Paul Rubner, P.C. the sum of $17,492.82 from the estate of Elmer Werth, $2,664.70 from the Don/Mark estate, and $1,661.00 from the Elmar Enterprises estate, for a total of $21,818.52. Appropriate orders will be entered in each matter reflecting this award.

### B. *Feder, Morris & Tamblyn, P.C.*

Mr. Harold Feder, of Feder, Morris & Tamblyn, P.C., has been employed pursuant to § 329 of the Code as special trial counsel for the estate of Elmer Werth. An Order authorizing his employment was entered on September 14, 1981. On February 9, 1983, an Order was entered expanding and clarifying Mr. Feder's authority. Mr. Feder filed Applications for interim fees on September 25, 1982 and May 2, 1983. The first Application requests fees and costs in the amount of $16,033.10. The period covered by this request is from May 12, 1981 to September 20, 1982, although, as noted above, the Order authorizing employment was not entered until September 14, 1981. The second Application requests fees and costs in the amount of $37,229.59 for the period September 21, 1982, through April 20, 1983.

The objections to these applications are numerous. The initial objection is that Mr. Feder should not be compensated for services performed prior to September 14, 1981, the date on which his employment was authorized.

Secondly, the creditors argue that Mr. Feder should not be paid for factual and legal investigation relating to litigation that may be abandoned to Elmer Werth personally. It is argued that the estate should only reimburse Mr. Feder for services performed solely in connection with the objection to Claim No. 39 litigation, and then only if Mr. Feder is successful in obtaining an order disallowing that claim to the IntraWest Bank of Denver.

Thirdly, the creditors suggest that Mr. Feder's first fee application does not contain the specificity required by F.R.B. 219(a) and *In re Nation/Ruskin, Inc., supra.* They urge that specificity is essential to separate those services performed solely for the estate from those performed for Mr. Werth personally.

With respect to the first objection, there is a split of authority as to whether a bankruptcy court should allow compensation for services performed prior to court authoriza-

tion. One line holds that a *per se* rule applies to bar compensation for employment rendered in the absence of a valid court order. *In re Calpa Products Company,* 411 F.2d 1373 (3rd Cir.1969); *Gochenour v. Cleveland Terminals Building Co.,* 142 F.2d 991 (6th Cir.1944); *Albers v. Dickinson,* 127 F.2d 957 (8th Cir.1942); *In re Progress Lektro Shave Corp.,* 117 F.2d 602 (2nd Cir.1941); *In re Rene Press,* 23 B.R. 381 (Bkrtcy.Mass.1982). The rationale for the rule was stated in *In re Eureka Upholstering,* 48 F.2d 95 (2nd Cir.1931) by Judge Learned Hand:

> "The order and the rule were passed to control serious abuses and are to be strictly observed; without an order of court upon full presentation of the relation of the proposed attorney with all other interests involved, not only may he not be retained, but he can recover nothing, no matter how beneficial, how arduous, his services." *In re Eureka Upholstering, supra,* at page 95.

On the other hand, there is a line of decisions which adopt a more flexible approach and hold that *nunc pro tunc* orders of appointment may be valid, under appropriate circumstances, where equitable principles so dictate. Cases indicative of this view are *Matter of Triangle Chemicals,* 697 F.2d 1280, 10 B.C.D. 325 (5th Cir.1983); *Matter of Laurent Watch Co.,* 539 F.2d 1231 (9th Cir.1976); *In re King Electric,* 19 B.R. 660 (D.C.Va.1982) and *In re Hite,* 2 F.Supp. 536 (D.C.Pa.1932). The reason for this approach was set forth in *In re King Electric, supra,* where the court recognized the unfairness of the rule and merely held, "[T]he United States Supreme Court has recognized the 'overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction.' *Marin v. Bank of England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 297 (1966)." *In re King Electric, supra,* at page 663.

The fees in question were rendered prior to the Order of employment on September 14, 1981, and covered the period May 12, 1981 to August 31, 1981. These fees total almost $1,600.00. I note that Elmer Werth paid $1,415.45 in fees to Mr. Feder out of his post-petition earnings, although he had no legal obligation to do so.

The policy enunciated by Judge Learned Hand may well have been the prevailing view under the circumstances extant at that time. I do not believe such a *per se* rule to be fair and equitable under the circumstances exigent in today's litigation.

There is no demonstrable prejudice to creditors as a result of Mr. Feder's earlier employment. Such employment appears to have been of benefit to and on behalf of what has become the estate of Elmer Werth. Pursuant to the authority of this court as a court of equity, and particularly under 11 U.S.C. § 105, the employment of Mr. Feder is authorized *nunc pro tunc* to May 19, 1981. That particular date is chosen because that is the date Mr. Feder and Mr. Werth entered into an employment contract. While this court is not bound by a previously-executed employment contract (see, § 328), that is the first time the parties recognized an employment relationship and it would be inappropriate to award fees for services performed prior to that date. Therefore, the fees incurred on May 12, 1981, will not be awarded. The consideration of fees incurred prior to an Order authorizing employment should be the exception and should only be allowed based upon overriding equitable principles, but should not be barred *per se.* Accordingly, it is my determination that the circumstances herein suggest the entry of a *nunc pro tunc* Order authorizing employment.

It is then necessary to examine the fees incurred during the period of employment and to address the remaining objections.

The first fee application lacks the specificity set forth in the second application. It is not clear in the first application what portion of fees were attributable to the IntraWest litigation and what portion to the Eaton lawsuit. Further, in the absence of a separation of the services provided and the attorney providing the service, together with the time expended and the hourly rate, it is difficult to address the

specific objections and inappropriate to sustain the request for fees.

Upon the submission of an amended application meeting the concerns expressed herein, the objections previously interposed will be reviewed and an appropriate award entered.

The second interim fee application is very detailed and precise. It identifies compensation sought for services performed in litigation between Werth and IntraWest Bank and litigation between Werth and Eaton Land & Cattle. The application contains a monthly breakdown of activities in these areas, a breakdown of fees and costs between the two areas, a detailed description of time spent and by whom, a description of services rendered and the date on which the services were performed. The application also lists the hourly rates of each individual performing legal services in the firm. Additionally, the weighted average hourly total for this application was $70.33 per hour, far below Mr. Feder's customary rate of $150.00 per hour.

There was no objection to the reasonableness of Mr. Feder's fees. Rather, the objections were two-fold: First, the creditors argued that time spent on the Eaton litigation should not be charged to the estate, since, if the litigation is abandoned by the estate, the proceeds of that lawsuit will not inure to the benefit of the estate. Secondly, with respect to litigation relating to IntraWest's Claim No. 39, the objectors contend that Feder should only be compensated if he is successful and, in any event, such compensation should not be forthcoming until it is determined whether the Plan will be adopted which abandons the lawsuit to Werth personally.

██ Under all of the criteria previously expressed herein, Feder's interim fees should be awarded in the Eaton lawsuit. Special counsel should not be expected to abide the payment of his interim fees until the creditors decide which Plan to adopt. The services, when they were tendered, were rendered for the estate. If a Plan is adopted which then abandons to Werth, personally, litigation for which such services were performed, the court will direct that Werth personally reimburse the estate for such expenses.

The fees and costs relating to the IntraWest lawsuit should likewise be paid. The substantive nature of the debtor's claims against IntraWest in the adversary proceeding are identical to the facts raised and tried in the objection the Bank's Claim No. 39. The record indicates that the vast share of fees incurred with respect to IntraWest Bank in this application were for preparation and trial on the objection to Claim No. 39.

It is my determination that the fees and costs incurred relative to the IntraWest Bank litigation, are necessary and of value to the estate. The average weighted hourly rate was approximately $70.00 per hour. Mr. Feder undoubtedly forfeited other employment to accept responsibility in this matter. Counsel for both sides performed with a high degree of skill and expertise in the trial. There appears to be no duplication of services in the Feder application and his activities were far from routine. Considerable investigation and preparation was necessary on the part of both litigants, and the matter was vigorously and professionally presented by both sides. Difficult questions of law relating to fiduciary responsibilities, obligations attendant to a lender-borrower relationship and contractual obligations under the circumstances of this case required expertise on behalf of both parties. No suggestion is made that the fee is beyond that customarily seen in this locality for similar commercial litigation. Counsel appearing in this matter were experienced, able and reputable litigators. Each counsel appears to have earned his fee. Presumably IntraWest has paid its counsel. Counsel for the estate should receive the same consideration.

Accordingly, an award of $35,183.83 in fees and costs is appropriate in the IntraWest litigation. The sum of $2,045.76 in fees and costs is awarded in the Eaton litigation, with the caveat previously expressed herein should such claims be abandoned to Mr. Werth personally.

## C. *Application to Retain Expert.*

An application to retain an expert witness under § 327 has also been placed before the court. The debtor suggests that the hiring of Mr. Al Krutsch is necessary to assist the debtor in the Eaton Land & Cattle litigation. Mr. Krutsch is an expert in the field of mortgage banking and finance.

Here, again, it is pointed out that Plan No. 2 abandons third-party litigation to Werth personally. If that Plan is chosen, it would be unfair to charge the estate for the services of an expert witness where the results of the litigation would not benefit the estate. The estate seeks an order authorizing Mr. Krutsch's employment and the payment to him of a $1,000.00 interim retainer fee.

An Order will enter allowing the employment of Mr. Al Krutsch as a professional person for the estate, with the payment of a $1,000.00 interim retainer fee, subject to the proviso that in the event Plan No. 2 is accepted, Mr. Krutsch's authority as a professional person for the estate will be terminated and Werth will be directed to remit the sum of $1,000.00 to the estate. Further, all future fee applications by Krutsch will be closely reviewed to insure he is not being compensated from the estate for services not benefitting the estate. At such time as his authority is terminated, it will be the responsibility of the person or persons being benefitted by his services to compensate Mr. Krutsch.

Appropriate orders will enter granting interim fees to Paul Rubner, P.C. and Feder, Morris & Tamblyn. An appropriate Order will enter authorizing Mr. Krutsch's employment under an interim retainer contract.