**In re NEIDIG CORPORATION, a Colorado corporation, d/b/a KRMX Radio Station, Debtor.**

Bankruptcy No. 87–B–07244–M.

United States Bankruptcy Court, D. Colorado.

Aug. 1, 1990.

**626**

Carole A. Carson, Denver, Colo., Chapter 11 Trustee.

Arnold C. Wegher, Wegher & Associates, P.C., Denver, Colo., for Chapter 11 Trustee.

Judith M. Matlock, Clanahan, Tanner, Downing and Knowlton, P.C., Denver, Colo., for Latino Broadcasting Corp.

## ORDER ON APPLICATION OF LATINO BROADCASTING CORPORATION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Application of Latino Broadcasting Corporation for Allowance of Administrative Expenses filed June 1, 1990 and the Response and Objection thereto filed by the Chapter 11 Trustee on June 25, 1990.

The central question before the Court is whether the company employed by the Chapter 11 Trustee to operate the Debtor-in-Possession's business during the reorganization is entitled to compensation as a cost of administration pursuant to 11 U.S.C. § 503(b)(1)(A). The Court concludes that the applicant is *not* entitled to compensation for services because (1) the company employed by the Trustee to manage the Debtor's business and its day-to-day operations was a "professional person" who was required to have been employed by the estate pursuant to 11 U.S.C. § 327 and B.R. 2014 and compensated in accordance with 11 U.S.C. § 330 and B.R. 2016, and (2) the company is *not* otherwise entitled to compensation pursuant to 11 U.S.C. § 503.

### I. *Background.*

On June 19, 1987, the Debtor filed a Petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. Debtor continued to operate .KRMX, a Spanish language radio station in Pueblo, Colorado, as a debtor-in-possession until October 22, 1988 when the station unexpectedly went off the air. The building was closed, utilities were cut off, and all employees were released. Consequently, the Court removed the Debtor from possession on October 25, 1988 and appointed Carole A. Carson ("Carson") as Trustee.

Carson took possession of the station and arranged for Latino Broadcasting ("Latino"), the owner and operator of KBNO, a Spanish language radio station in Denver, Colorado, to manage and operate the Pueblo station. The station resumed operations on October 28, 1988 under the management of Latino. Carson and Latino subsequently

entered into an employment agreement dated November 1, 1988. The employment agreement provided, *inter alia*, that Latino would supply disc jockeys and sales personnel[1] in exchange for (1) reimbursement of payroll and local sales expenses at the rate of 150% of the gross expenditures; (2) full reimbursement of out-of-pocket expenses; and (3) a management fee of $75.00 per month. Latino operated the station until September 22, 1989 when Carson appointed a replacement.[2] The employment agreement was not submitted to creditors or the Court for consideration or approval; no Court authorization was obtained.

Presently before this Court is Latino's application for allowance of its management fee and other expenses, as provided under the employment agreement, as an expense of administration pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1). Specifically, Latino requests compensation as follows:

| | | |
|---|---|---|
| Payroll and local sales expenses (reimbursed at 150% of gross)[3] | $ | 65,990.06 |
| Out-of-pocket expenses[4] | $ | 10,366.73 |
| Management fee ($75.00/month) | $ | 600.00 |
| Loss on Cinco de Mayo dance[5] | $ | 1,240.61 |
| Less: Payments received | ($ | 27,648.40) |
| | | |
| Total compensation requested[6] | $ | 50,549.00 |

1. Latino initially sent some of its Denver-based employees to Pueblo to run the station. Local personnel were subsequently hired to fill most, but not all, of the necessary positions.

2. The contract with Latino's successor, or replacement, Ventana Enterprises, Inc., was retroactively rescinded in November, 1989. Although not directly related to the Latino contract, the reasons for Ventana's rescission include opposition to the agreement by the U.S. Trustee and the evident conflicts of interest and appearances of impropriety. Ventana, for example, was owned and managed in part by Diane Young who served as co-counsel for Neidig's Unsecured Creditors' Committee prior to her July, 1988 resignation, and who is also the daughter of Mr. Young who simultaneously served as counsel for the Neidig Unsecured Creditors' Committee and for Latino, as well as for its president, Edward Romero. *See infra* pp. 630–31.

3. Latino states that it agreed to waive compensation for its executives, Edward and Janis Rome-

Latino submits that these expenses were incurred in the ordinary course of Debtor's business and constitute "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

Carson objects to the allowance of Latino's application primarily because of an alleged inadequate accounting. Specifically, Carson asserts that Latino has not provided all receipts. Further, Carson believes that Latino hid revenues generated by the Cinco de Mayo dance, diverted the funds to their own use, and may have engaged in other activities, held out to be events sponsored by the station which were neither known to nor authorized by Carson.

## II. *Discussion.*

■ The issue of whether Latino's request is entitled to an administrative priority must be preceded by a preliminary question: was Latino entitled to incur these expenses at all without approval of the Bankruptcy Court? The answer depends on the nature of the expenses.

Section 327(a) of the Bankruptcy Code requires Court approval for the employment of "attorneys, accountants, apprais-

ro, and to accept only 100% reimbursement of gross payroll for November 1988. For every other month, Latino alleges that there was never an agreement to accept less than the amounts provided by the terms of the employment agreement.

4. This amount includes amounts expended for travel, meals, and lodging for Latino's Denver-based employees while they worked in Pueblo. Various other fees and expenses are also apparently included in this figure.

5. Latino organized a Cinco de Mayo dance and outdoor festival in 1989. Ticket sale and advertising revenues were collected by Latino and expenses were paid directly from the revenues. Latino states that immediate payment was expected by the performers. Carson was later provided with an accounting.

6. Latino provided certain business insurance at no additional charge.

ers, auctioneers, *or other professional persons* ... to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (emphasis added). While the terms "attorney," "accountant," "appraiser," and "auctioneer" are not the subjects of much debate, the amorphous term "professional person" has created some difficulties in application.

■ For the purpose of this section, a "professional person" is best described as a person[7] who plays "a central role in the administration" of the debtor's estate. *Matter of Seatrain Lines, Inc.,* 13 B.R. 980, 981 (Bankr.S.D.N.Y.1981). In *Seatrain Lines,* the debtor-in-possession asked the court for approval of the employment of two maritime engineers as consultants. The court held that, while the engineers would play an important role in the mechanics of the debtor's operation, their retention would not affect the administration of the debtor's reorganization. *Id.,* at 981. *See also, U.S. ex rel Kraft v. Aetna Casualty & Surety Co.,* 43 B.R. 119, 121 (M.D. Tenn.1984) (the court distinguished *Seatrain Lines* because some of the services did benefit estate administration); *In re Johns–Manville Corp.,* 60 B.R. 612, 619–621 (Bankr.S.D.N.Y.1986) (lobbyists who were not hired to represent or assist the debtor in carrying out its duties under title

11, who did not play a part in negotiating a plan, adjusting debtor-creditor relationships or disposing of or acquiring assets, but who performed a function "completely external to the reorganization process by merely presenting [the debtor's] views on proposed and pending legislation as they had done pre-petition," were not professionals); *In re Northeast Dairy Cooperative Federation, Inc.,* 74 B.R. 149, 152–153 (Bankr.N.D.N.Y.1987) (the focus should be on the "relevance those services have in the course of a chapter 11 proceeding"); *In re Lowry Graphics, Inc.,* 86 B.R. 74, 78 (Bankr.S.D.Tex.1988) (the services in question "intimately involve[d] administration of bankruptcy estate"); *In re Pacific Forest Industries, Inc.,* 95 B.R. 740, 743 (Bankr.C.D.Cal.1989) (only those who deal with the actual reorganization of a debtor, rather than the ongoing business of a debtor, are required to be employed with approval of the Court); *In re Century Investment Fund VII Limited Partnership,* 96 B.R. 884 (Bankr.E.D.Wis.1989) (a property manager who rented apartments and arranged for maintenance was not a professional because he did not play a direct role in the bankruptcy proceedings); *In re Rusty Jones, Inc.,* 109 B.R. 838, 844 (Bankr.N.D.Ill.1989) (the court found it "difficult to envision a more expansive role" in administration).[8]

■ While a few courts seem to focus upon whether or not the work performed is

**7.** The definition of "person" includes "individual, partnership, and corporation, but does not include governmental unit." 11 U.S.C. § 101(35).

**8.** A wide range of people have been found to fit within the definition of "professional." Many of these courts have come to this conclusion with little or no written analysis. *See, e.g.* Bennett v. Williams, 892 F.2d 822 (9th Cir.1989) (property manager); *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99 (3rd Cir.1988) *cert.* denied 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (broker marketing aircraft); *Matter of Federated Department Stores, Inc.,* 114 B.R. 501 (Bankr.S. D.Ohio 1990) (financial consultants); *In re Providence Television Limited Partnership,* 113 B.R. 446 (Bankr.N.D.Ill.1990) (media broker hired to sell television station); *In re 222 Liberty Associates,* 110 B.R. 196 (Bankr.E.D.Pa.1990) (realtor); *In re Phoenix Steel Corp.,* 110 B.R. 141 (Bankr.D.

Del.1989) (workout specialist); *In re Microwave Products of America, Inc.,* 94 B.R. 971 (Bankr.W. D.Tenn.1989) (public relations firm); *In re American Int'l Airways, Inc.,* 69 B.R. 396 (Bankr. E.D.Pa.1987) (financial management consultants); *In re Ewing,* 54 B.R. 952 (D.Colo.1985) (real estate broker); *In re Simasko Production Co.,* 47 B.R. 444 (D.Colo.1985) (investment broker); *In re Malden Mills, Inc.,* 42 B.R. 476 (Bankr.D.Mass.1984) (management consultants); *In re Zeus America Management Consultants, Inc.,* 27 B.R. 853 (Bankr.N.D.Ohio 1983) (private investigator); *In re Morton Shoe Companies, Inc.,* 22 B.R. 449 (Bankr.D.Mass.1982) (financial expert); *In re WFDR, Inc.,* 22 B.R. 266 (Bankr.N.D.Ga.1982); *In re Holiday Mart, Inc.,* 18 B.R. 212 (Bankr.D. Haw.1982) (architect). *But see, Matter of Reda, Inc.,* 54 B.R. 871, 882 n. 25 (Bankr.N.D.Ill.1985) (insurance adjuster is not a professional person).

largely ministerial (*In re Interstate Restaurant Systems, Inc.*, 61 B.R. 945, 949 (S.D.Fla.1986)), and others look to the debtor's past history of employing the type of person in question and whether other companies similarly situated routinely employ such persons (*In re Johns–Manville Corp.*, *supra* at 618–619), perhaps the most common determinative factor appears to be the amount of autonomy or discretion the person is given by the debtor or trustee in performing its services. *In re Rusty Jones, Inc.*, *supra* (the person made virtually all management decisions); *In re Fretheim*, 102 B.R. 298, 299 (Bankr.D.Conn. 1989) (such a test "is consistent with a primary purpose of § 327(a) to prevent conflicts of interests which 'erode the confidence of [the] estate to say nothing of public confidence in the administration of justice in bankruptcy courts.' ") (quoting *In re Intech Capital Corp.*, 87 B.R. 232, 236 (Bankr.D.Conn.1988)). *See generally, In re Leslie Oil & Gas Co., Inc.*, 98 B.R. 774 (Bankr.S.D.Ohio 1989); *In re Century Investment Fund VII Limited Partnership*, *supra; In re Park Avenue Partners Limited Partnership*, 95 B.R. 605 (Bankr.E.D. Wis.1988); *In re Frederick Petroleum Corp.*, 75 B.R. 774 (Bankr.S.D.Ohio 1987). The *Century Investment Fund* and *Park Avenue Partners* cases both involved replacement apartment managers who performed the day-to-day rental and maintenance duties necessary regardless of whether or not a bankruptcy is filed. Neither manager had the power to set rents, incur expenditures over a certain level or make long-range decisions. The trustees, or debtors-in-possession, retained a strong and direct hand in operations.

In the present case, Latino appears to have provided rather specialized services and acted with relatively unfettered discretion and autonomy. Employees were hired, cash advances were made, advertising was sold, new events were scheduled and held, and unusual debts were both incurred and paid from proceeds without limitation or prior authorization from Carson, the Trustee. Generally, it appears that Latino conducted the day-to-day affairs of the business, handled various technical operations

of the facility, and was effectively responsible for administration of the station.

The *Frederick Petroleum* case is analogous. In *Frederick Petroleum*, an oil and gas operator was given complete discretion over the selection and timing of wells. He was given the ability to independently negotiate, execute and cancel transportation and sales contracts and the authority to advance money for routine operations. Complete financial management authority was his with only a summary report required to be sent to the trustee to entitle him to a "broker's fee." After reviewing the above-stated facts the court concluded, "[a]lthough the Court does not believe that granting *one* of those rights to an operator, without more, necessarily means that operator becomes a professional person, *the aggregation* of such delegated rights ... makes [the operator] a professional person in this instance." *In re Frederick Petroleum Corp.*, *supra* at 780 (emphasis added).

Likewise, this Court finds that unless Latino was required to meet—and met—the standards of 11 U.S.C. § 327, then it was inappropriate to delegate these aggregate rights and authority to Latino which amounted to virtual control of the station and its operations without retaining the responsibilities and appropriately exercising the authority and decision-making power in Carson. Latino's specialized and important services had more than a tangential relationship with the administration of the estate. The ongoing and successful operation of the station was pivotal to the business and effectiveness and success of any proposed plan. The station's value as a going concern far outweighed its liquidation value. Latino was employed to keep the station as a going concern and was responsible for maintaining its value.

Simply stated, Latino's role as manager of the Debtor's business was central and significant; its conduct very consequential to the reorganization. Measured by most, if not all, of the criteria cited above, Latino qualified as a "professional person." This Court, therefore, finds that Latino was a

"professional person" subject to the provisions of 11 U.S.C. § 327.[9]

■ The sheer complexity and enumerable "entanglements" involved in this case further support this Court's conclusion.[10] Full disclosure in advance and employment pursuant to Court order under Section 327, in this case, would have well served the interests of all parties.

Briefly described, Mr. Young served as the attorney for two other Chapter 11 debtors-in-possession, Latino and Edward Romero ("Romero"), president and principal shareholder of Latino, *while concurrently serving* as the attorney for the Unsecured Creditors' Committee of the instant Debtor, Neidig. At the time the Court approved the employment of Young as counsel for the Neidig Unsecured Creditors' Committee, the Court was not advised of and did not know that (1) Young held a promissory note, making him a substantial creditor of Latino, and (2) Young's immediate family members were the sole shareholders of a corporation which owned shares of stock in Latino. Young had a stake in the financial success of Latino. Further, Latino became a creditor of the instant Debtor's estate in July 1988 by purchasing a claim previously held by another creditor of Neidig's estate.

Following the unexpected shut-down of the station, Young, on behalf of the Unsecured Creditors' Committee, recommended that this Court appoint a trustee and further recommended that the U.S. Trustee select Carson to fill that position. Almost immediately after her appointment as trustee, Carson employed Latino to operate and manage the station under a contract "drafted by Young on behalf of Latino, after consultation with and concurrence of the Creditors' Committee" of the instant Debtor. Latino's subsequent dismissal as station manager by Carson, due to a deteriorating relationship with Carson, appears to have closely followed, if not paralleled, the deterioration and ultimate termination of the relationship between Latino and Young.

Carson employed Latino at the suggestion of Young without notice to creditors, or the Court, and opportunity for a hearing, and without complying with 11 U.S.C. § 327 of the Bankruptcy Code or Rule 2014 of the Bankruptcy Rules. Thus, the existence of and circumstances surrounding Latino's employment, Latino's connections with Edward Romero, the Debtor, and Young, as well as any compensation arrangements, were not fully disclosed to creditors, interested parties, or this Court until the filing of an application for fees.

This case graphically demonstrates the congressional wisdom in requiring prior Court approval of professional persons with the attendant notice to creditors. Had notice been given and prior approval sought in this case, both the latent "entanglements" between Young and the three bankruptcy estates and the extant appearance of impropriety would have been brought out in the open during the hearing and dealt with prior to the performance of services for which Latino now seeks a fee. *See generally, In re Carolina Sales Corp.,* 45 B.R. 750, 753 (Bankr.E.D.N.C.1985).

Latino requests compensation under 11 U.S.C. § 503(b)(1)(A). This Court has

---

**9.** The exception for professional persons on salary in 11 U.S.C. § 327(b) does not fit the present situation. Latino is not a salaried employee. Its compensation was based upon a nominal management fee and a 150% rate of return on the salary and wage payments expended. The latter figure represents over 97% of the net proceeds from the arrangement. *See, In re Century Investment Fund VII Limited Partnership,* 96 B.R. 884 (Bankr.E.D.Wis.1989); *In re Park Avenue Partners Limited Partnership,* 95 B.R. 605 (Bankr.E.D.Wis.1988). "By referring to a regularly employed professional person on salary, the Bankruptcy Code envisions an existing department within a company or in-house counsel, employed on salary, who will be helpful to the trustee in handling routine matters incident to normal business activity." *In re Carolina Sales Corp.,* 45 B.R. 750, 753 (Bankr.E.D.N.C. 1985) (management consultant was an independent contractor not a salaried employee).

**10.** A lengthy written opinion by the Court in this case describes the entanglements, conflicts, and appearances of impropriety emanating from the three Chapter 11 cases. The Court denied fees to Young, counsel for the Neidig Unsecured Creditors' Committee, as a consequence. *See,* footnote 2, *supra.*

found that Latino is a professional person, thus subjecting it to the requirements of 11 U.S.C. §§ 327, 330(a) and 503(b)(2) instead. The record reflects that these requirements were not met.

 Assuming, *arguendo*, that Latino was not a "professional person" and could correctly apply for an allowance of an administrative expense under 11 U.S.C. § 503(b)(1)(A), Latino has the burden of proving that the expenses were both actual and necessary to preserve the estate. *Matter of Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986). Because bankruptcy law demands equality of distribution absent a compelling justification for a different result and because administrative expenses are given a priority status by 11 U.S.C. § 507(a)(1), thereby depleting the funds available to general unsecured creditors, administrative expense claims are subject to careful scrutiny. *Id.* The terms "actual and necessary" are to be construed narrowly.[11]

First and most prominent, given the circumstances of this case and the nature and amount of fees requested, the Latino Application for fees and expenses appears inadequate and legally insufficient. The quality and quantity of information supplied justifying an award of fees and expenses is wholly deficient. *See, Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983); *In re Werth*, 32 B.R. 442 (Bankr.D.Colo.1983); *In re Land, Land v. First National Bank in Alamosa*, 116 B.R. 798 published opinion of the Honorable John L. Kane, entered July 24, 1990.

As the amounts allowed as administrative expenses under 11 U.S.C. § 503(b)(1)(A) must be "actual" and "necessary," Latino cannot recover more than the amounts satisfactorily proved as such. Latino would be limited, in all likelihood, to a recovery of payroll and local sales commission expenses of no more than 100%, rather than the 150% requested.[12]

While the language of 11 U.S.C. § 503(b)(1)(A) clearly contemplates the reimbursement of wages and salaries as an administrative expense, the statute does not address the treatment of out-of-pocket expenses. Such expenses have been found "necessary" for someone acting *outside* his ordinary course of business. *See, In re Saroca Corp.*, 46 B.R. 533 (Bankr.D.Me. 1985). Where, however, employees are "enlisted to perform their usual duties, and their effort is reflected in the payment of their regular salaries" and where some employees "understandably need[ ] transportation from out of town and lodging for the duration of their employment; given the immediate and temporary nature of their assignment, these expenses appear to be 'actual and necessary' to sustain their employment." *Matter of D'Lites of America, Inc.*, 108 B.R. 352, 356 (Bankr.N.D.Ga. 1989). The Court in *D'Lites*, however, found that expenses such as dining and entertainment tabs "are those of everyday living, and [the] request that the estate absorb them is not necessary and is, in fact, excessive." *Id.* This Court is likewise concerned and troubled by the $10,-366.73 requested for out-of-pocket ex-

---

11. "The phrase 'actual and necessary' can define an infinite variety of costs and expenses. There really is no way to define with certainty what courts might or might not consider to be covered by this language." North Bankr.L & Prac. § 12.11. Construing the identical terms in 11 U.S.C. § 503(b)(3)(D), former Bankruptcy Judge John P. Moore concluded that Congress left to the discretion of the trial court the determination, on a case-by-case basis, whether a particular kind of expense is compensable. "Suffice that § 503(b)(3)(D) compensation is grounded upon the limitation that the expenses be 'actual and necessary,' and leave each application to be determined upon its own merits. Hence, there will always remain in each case questions of whether the services of any applicant creditor have been 'substantial' and whether the expenses incurred in that service have been 'actual' and 'necessary.'" *In re Grynberg*, 19 B.R. 621, 623 (Bankr.D.Colo.1982).

12. The Court notes that, after a preliminary review of the documents which support the application, approximately $1,200.00 is included in payroll which more properly belongs in, or, in some cases, already also appears in, the out-of-pocket expense classification. Additionally, no copies of cancelled checks were provided for approximately $5,500.00 of the requested amount.

penses.[13]

The result of this ruling is admittedly harsh. However, this court shares the principles expressed and enforced in this District that the integrity of the bankruptcy system and fundamental concepts of adequate notice to creditors and due process must be protected. *See, In re Ginco, Inc.,* 105 B.R. 620 (D.Colo.1988); *In re WVS, Investment Joint Venture,* Case No. 89–F–331 and *In re Tri–Crown Corporation,* Case No. 89–F–517, order of Chief Judge Sherman Finesilver dated January 4, 1990. Protection of the integrity of the system is, unfortunately, sometimes at the expense of maximizing assets of the estate, as in *Ginco,* or disallowing claims against the estate.

For the aforementioned reasons, the Application of Latino Broadcasting Corporation for Allowance of Administrative Expenses is hereby DENIED. Applicant is awarded no compensation pursuant to 11 U.S.C. § 503(b)(1)(A). Judgment shall enter accordingly.

---

**13.** A preliminary review reveals that, of the amount requested, over $2,800.00 is attributed to food or $30.00 per day food allowances. This presents a problem with *both* the "actual" and "necessary" requirements of 11 U.S.C. § 503(b)(1)(A). Over $900.00 is requested for gasoline. A great portion of that amount appears to be attributable to allowances and not actual expenditures. Other amounts, such as over $86.00 for "miscellaneous" expenses, $50.00 for a "slush fund," $40.00 for "discretionary use," and over $1,500.00 without any specific allocation are also troublesome to this Court.