**In re SCHWEMMER HARDWARE CO., INC. Debtor.**

**Bankruptcy No. 83–02688S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 4, 1989.

Allan K. Marshall, Philadelphia, Pa., trustee, pro se.

Edward J. DiDonato, Philadelphia, Pa., for Affiliated Auctioneers.

Michael A. Cibik, Philadelphia, Pa., for trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This dispute, arising upon the *pro se* Motion of ALLAN K. MARSHALL, the Trustee appointed in this bankruptcy case after it was converted from Chapter 11 to Chapter 7 on June 5, 1986 (hereinafter "the Trustee"), to Compel Affiliated Auctioneers (hereinafter "the Auctioneer") to Turn Over All Proceeds in His [sic] Possession to him, causes us to review the procedure which auctioneers should follow in seeking compensation for services from a debtor estate. We hold that auctioneers must, like other professionals, submit an Application for compensation, after notice pursuant to Bankruptcy Rule (hereinafter "B.Rule") 2002(a), before retaining any proceeds in their hands for compensation. We further hold that an Application describing the services performed is necessary, but that this need not be done in the demanding format established in *In re Meade Land & Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975). However, a request for reimbursement of costs in the format established in *In re Metro Transportation Co.*, 78 B.R. 416, 420 (Bankr.E.D.Pa.1987); and *In re Mayflower Associates*, 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987), is necessary.

We resolve the instant dispute by holding that (1) for purposes of 11 U.S.C. § 549(d), the transfer of compensation to the Auctioneer did not take place until February, 1989, eliminating that Code section as a defense to the Trustee's motion; (2) the Auctioneer is only entitled to collect his seven (7%) percent commissions as to the ultimate sale price of the property in issue of $65,700 and not the purchaser's unconsummated bid of $73,000; and (3) the only costs properly documented for reimbursement were advertising costs of $2,775.40. Therefore, the Auctioneer is only entitled to compensation of $7,374.00, which, after deducting the $739.46 in interest charges paid by the Auctioneer to the Trustee accruing from retention of sums deposited, obliges the Auctioneer to turn over $1,441.40 to the Trustee at this time. We shall, however, give all parties interested in this matter an opportunity to object to the resolution of the compensation due to the Auctioneer and the act of the Trustee in unilaterally reducing the bid in consummating the sale of the property.

The underlying bankruptcy case was filed by the Debtor, a retail hardware store, under Chapter 11 of the Bankruptcy Code on July 5, 1983, and was converted to Chapter 7 on June 5, 1986. On October 28, 1986, the Trustee filed a proceeding, at Adversary No. 86–1289, seeking an Order to sell the Debtor's three parcels of realty situated at 522–24 West Girard Avenue, 516–18 West Girard Avenue, and 965 North Randolph Street in Philadelphia free and clear of encumbrances.

In furtherance of such a sale, the Trustee filed an Application to allow him to hire the Auctioneer to sell the realty. Upon our reduction of the requested commission rate of ten (10%) percent, the Auctioneer was "approved to conduct the sale at a rate of compensation of seven (7%) percent, plus reasonable expenses incident thereto" in our Order of November 5, 1986.[1]

After a judgment was entered in favor of the Trustee without opposition in the adversary proceeding, an auction of the three parcels of realty and the Debtor's hardware inventory was conducted by the Auctioneer on February 3, 1987. One Sonnie (or Sol) Basen (hereinafter "Basen") was the successful bidder at a figure of $73,000.

Thereafter, the sale of the property in issue to Basen was memorialized in a written agreement of sale. However, closing was apparently delayed because of the presence of certain unauthorized persons in the realty and the consequent inability of the Trustee to deliver a vacant premises to Basen, as required by the terms of the agreement of sale. After an aborted attempt to sell the property to a third party, the Trustee apparently closed the sale to Basen, presumably with some of the unauthorized residents intact, for a reduced price of $65,700.00, in February, 1989.[2]

On February 13, 1989, the Auctioneer, without notifying interested parties pursuant to B.Rule 2002(a), prepared an Affidavit documenting the following:

| | |
|---|---|
| Gross proceeds of sale | $73,000.00 |
| Deposit received | 11,000.00 |
| Expenses | 3,605.40 |
| Commission (7% of $73,000) | 5,110.00 |
| Refund to Trustee | $ 2,284.60 |

The $2,284.60 sum was remitted by check to the Trustee on February 13, 1989. Apparently upon demand of the Trustee for interest on the deposit, the Auctioneer forwarded another check of February 21, 1989, to the Trustee in the amount of $739.46, allegedly representing interest ac-

---

**1.** This Application was considered and decided on an *ex parte* basis. At present, such an application would require a five-day notice and opportunity to object thereto to all interested parties and the United States Trustee pursuant to Local Bankruptcy Rules (hereinafter "L.B. Rules") 9013.3(c)(2), (d), prior to its entry.

**2.** We note, with some dismay, that the Trustee did not file a motion to seek approval from this court for effecting the closing for a reduced price. Had he obtained court approval, he would have avoided the accusations of the Auctioneer, whose standing to so contend is questionable, that he breached his fiduciary duty in unilaterally so doing. We shall require him to provide notice of his actions to all interested parties in order that they may, at least at this point, voice any objection which they have to his actions.

cruing on the $11,000 deposit during the two-year period that it remained in its hands. The Trustee, apparently unsatisfied with this response, filed the instant motion on May 10, 1989, requesting that we direct the Auctioneer to turn over the sum of $9,065.94 to him.[3]

The motion came before us for a hearing on June 15, 1989. After a heated exchange between counsel, we directed the parties, in an Order of June 16, 1989, to submit the following:

   a.  AA [the Auctioneer] shall file a detailed Application for Compensation, in accordance with *In re Meade Land & Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987), and a Memorandum or Brief addressing the issue of what procedures it believes should be followed by auctioneers generally to receive compensation and whether it believes that these procedures were or should have been followed here on or before July 6, 1989.

   b.  The Trustee shall file any Objections to the application; the general procedures outlined by AA; the application of those proceedings to the instant matter; and what he believes AA should be awarded here on or before July 27, 1989.

The submissions of the parties, though timely, presented little assistance in addressing the topic of the general procedures which should be followed by auctioneers to obtain compensation from estates in this court. In a Memorandum featuring liberal use of the exclamation mark (!), presumably to express indignation as to several of the Trustee's allegations, the Auctioneer first argues that, since the sale occurred on February 3, 1987, the Trustee's motion is precluded by 11 U.S.C. § 549(d). *See In re 31–33 Corp.*, 100 B.R. 744, 747–48 (Bankr.E.D.Pa.1989). It then claims

that its commissions should be computed on the bid price of $73,000; that it would be an error to so much as reconsider the seven (7%) percent commission computed on this sum; and that the procedure utilized by the Auctioneer in obtaining its commission should be sanctioned because the Auctioneer had employed the identical procedure for forty (40) years in its submissions to this court. Finally, it attached receipts for $2,775.40 out of its total costs claimed of $3,605.40, which represented expenditures on advertising. The balance of the costs are itemized, without receipts, as follows:

| | |
|---|---:|
| Labor (name and dates of employment of specific individuals is included) | $495.00 |
| Work of "Girl" in Office | 95.00 |
| Visits to premises by L. Prince | 240.00 |
| | $830.00 |

The Trustee's Memorandum, while not including any exclamation marks, is punctuated with accusations that the Auctioneer "is attempting to rip off the Trustee by padding the expenses ... and [attempting to] extort money from the Trustee" and is engaging in a "shameless attempt ... to hold the Trustee as a hostage" for which it "should be reprimanded for perpetrating a fraud upon this court." Without citing any authority, the Trustee claims that the Auctioneer's commission should be calculated on the $65,700 "ultimate sale price," not the $73,000 bid. He also contends that, except for the advertising expenses, the Auctioneer ignored our admonition to comply with *Mayflower Associates, supra.*

Both parties appear to agree that an auctioneer is a "professional person" whose employment must be authorized pursuant to 11 U.S.C. § 327(a) and to whom compensation is payable only after appointment and only pursuant to the provisions regarding limitations on compensation of professional persons set forth in 11 U.S.C. § 328. The few decisions which we found addressing the specific issue of compensa-

---

**3.** The Trustee calculated this figure by adding interest at five (5%) percent per annum to the $11,000 deposit figure for a total of $12,100. He then deducted the purported total received of $3,034.06 (actually, the total was $3,024.06). The difference which he computed was $9,065.94. (Actually, the difference was $9,075.94). Apparently, the position of the Trustee is that all of the funds should be returned to him and he should therefore distribute the compensation due to the Auctioneer to it. See page 642 *infra.*

tion of auctioneers uniformly agree as well. *See In re Alcap Mfg. Co.,* 457 F.Supp. 1247, 1253 n. 8 (D.Conn.1978); *In re Sweet,* 23 F.Cas. 543, 544 (E.D.Mich.1874) (No. 13,-688); *In re Yiesley,* 64 B.R. 360, 362 (Bankr.S.D.Tex.1986); and *In re R.E. Tull & Sons, Inc.,* 28 B.R. 112 (Bankr.D.Md. 1983). *Cf. 31–33 Corp., supra,* 100 B.R. at 746–47 (a realtor is a professional within the scope of § 327(a)). Procedurally, an application for compensation in excess of $500, by any professional, including an auctioneer, must be preceded by notice pursuant to B.Rule 2002(a)(7). In a Chapter 7 or Chapter 11 case, compliance with L.B.Rule 2002.3 is also required.

Here, the Auctioneer took it upon itself to compute its own compensation and even proceeded to collect the compensation it claimed was due to it by setting this sum off against the deposit which it was holding from the purchaser without submitting an application or providing the requisite notice pursuant to B.Rule 2002(a)(7). The fact that the Auctioneer may have proceeded in this manner for forty (40) years cannot change the fact that so proceeding was improper and cannot be countenanced any longer now that we have carefully examined it against the applicable provisions of the Bankruptcy Code and Rules.

■ Similarly, we cannot agree with the Auctioneer's contention that it would be inappropriate for this court to review the commission rate of seven (7%) percent which we authorized in our Order of November 5, 1986, appointing the Trustee at the time that specific compensation is awarded to it. Allowing compensation on a commission basis is comparable to authorizing compensation of a professional, such as an attorney, on a "contingent fee basis." While compensation on such a basis is expressly deemed allowable under § 328(a), that Code section goes on to state as follows:

Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Thus, any order of this court allowing compensation by a percentage contingent upon the proceeds of a recovery or sale is implicitly subject to alteration if the terms prove to be inequitable. *See, e.g., In re Lytton's,* 832 F.2d 395, 399–400 (7th Cir.1987), and cases cited therein.

It is for this reason that we require attorneys who have been appointed to perform services on a contingent-fee basis to submit detailed fee applications regarding the dates, precise tasks performed, and the time expended to perform those tasks pursuant to *Meade Land, supra,* before we will grant such applications. *See In re Crouse Group, Inc.,* 75 B.R. 560 (Bankr.E. D.Pa.1987). We must reserve the power to adjust the contingent fee if the net recovery is excessive in light of the efforts actually expended by the professional.

Although we requested the Auctioneer here to prepare an application consistent with *Meade Land,* and it has failed to do so, we are not inclined to penalize the Auctioneer for this failing. Upon further reflection, we think that, in most instances, it is unfair to make an auctioneer, like a realtor, justify his time expended and hourly rate with a *Meade Land*-type submission on the issue of compensation for services rendered. Such detail is not required from all players in a bankruptcy case. *See In re Greenley Energy Holdings of PA., Inc.,* 102 B.R. 400, 405–06 (E.D.Pa.1989) (Trustee seeking commissions need not file an Application with the detail required in *Meade Land*). *But see* the decision of this court reversed by the foregoing decision, *In re Greenley Energy Holdings of PA.,* 94 B.R. 854, 857–58 (Bankr.E.D.Pa.1989). However, as in the case of a trustee who must make some showing other than a mere computation to justify receipt of the maximum compensation pursuant to 11 U.S.C. § 326(a), surely *some* description of the services performed, which justifies compensation at the rate tentatively ap-

proved at appointment, must be provided by an auctioneer before such compensation can be awarded.

Moreover, when we approach the area of reimbursement of costs allowable to auctioneers or realtors in addition to commissions, we can perceive of no reason why an auctioneer or a realtor should be obliged to provide any less documentary support than any other professionals, including attorneys. Therefore, we see no reason why the Auctioneer here should be excused from the procedural requirements which must be met to recover reimbursement of costs set down in *Mayflower Associates, supra,* 78 B.R. at 47, as follows:

"A showing of actual and necessary cannot be accomplished merely by listing in the fee application the amount of the expenditure next to the type of expenditure. Detail must be provided to substantiate the actual and necessary nature of expenditures. For example, when claiming reimbursement for telephone calls, counsel should specify the date of each call, the person to whom the call was made, the subject matter of each call, and the amount charged for each call. This should not be difficult to do as the information should be readily available. In the case of photocopying, counsel should inform the court of the number of copies, the cost of each copy, and provide, if possible, a breakdown of the reasons why photocopying of certain documents was necessary." [quoting our predecessor, the Honorable William A. King, Jr., in *In re American International Airways, Inc.,* 47 B.R. 716, 725 (Bankr.E.D.Pa.1985) ].

... Photocopying will be allowed at no more than twenty ($.20) cents a page and only if there is a "breakdown" of what was compiled and the reasons why all of the copying for which compensation is sought was necessary. Other costs will be totally disallowed if not accompanied by receipts and some reasonable explanation as to why such expenditures were necessary (footnote omitted).

Thereafter, in *Metro Transportation, supra,* 78 B.R. at 420, we clarified our policy regarding requests for reimbursement of costs except for generally-allowable filing fees, transcripts, and witness fees, as follows:

[o]ther items of costs, which we opined in *National Paragon I* [68 B.R. 337 (Bankr. E.D.Pa.1986), *rev'd,* 76 B.R. 73 (E.D.Pa. 1987) should be non-compensable overhead, will be allowed *only* if (1) Explanations as to the specific purpose of each of these items of costs are provided; and (2)(a) In the case of photocopying, the number of copies, the cost of copies, and reasons why photocopying was necessary are provided; and (b) In the case of all other items, including special postage, long distance telephone calls, delivery services, travel (other than local travel which we will not allow in any event), telecopies, and Lexis charges, receipts as well as specific explanations of the reasons why the cost was necessary are provided.

■ Finally, the law applicable to the issue of the amount upon which the Auctioneer's commission of seven (7%) percent must be computed is rather clear. It is black-letter law that an auctioneer's commissions "do not accrue until a sale is effected, nor may they be recovered on a bid not complied with." 7 AM. JUR.2d 413 (1980). *See also, Childs v. Ragonese,* 296 Md. 130, 460 A.2d 1031, 1034–36 (1983); *Cochran v. Johnson,* 13 S.C. 21 (1822); and Annot., *Auctioneer's Action for Commissions Against Seller,* 38 A.L.R.4th 170, 186, 190, 192–93 (1985).

We now apply the general principles established herein to the matter at bar. We first observe that, in its Memorandum of law, the Auctioneer contends that the Trustee's motion is necessarily in the nature of a proceeding under 11 U.S.C. § 549 and is thus barred by § 549(d), which provides that an action under § 549 "may not be commenced after the earlier of" two years from the date of the transfer or the dismissal or closing of the case." A comparable argument prevailed for the realtor in *31–33 Corp., supra,* 100 B.R. at 747–48.

However, unlike the realtor in *31–33 Corp.,* the Auctioneer here never raised the

"statute of limitations" provided in § 549(d) as an affirmative defense in its Answer. Such an omission generally constitutes a waiver of such a defense. *See, e.g., Zelson v. Thomforde,* 412 F.2d 56, 59 n. 10 (3d Cir.1969); *VanSant v. American Express Co.,* 169 F.2d 355, 372 (3d Cir. 1948); *In re Frascatore,* 98 B.R. 710, 723–24 (Bankr.E.D.Pa.1989); and *In re Gurst,* 79 B.R. 969, 979 (Bankr.E.D.Pa.1987), *appeals dismissed,* C.A. No. 88–2082 (E.D.Pa. August 9, 1988), *aff'd,* 866 F.2d 1410 (3d Cir.1988); and 88 B.R. 57 (E.D.Pa.1988). However, elsewhere in the *Frascatore* decision, 98 B.R. at 718–19, we noted that the language of 11 U.S.C. § 546(a), providing that an action under 11 U.S.C. § 544 "may not be commenced after" two years from the appointment of the trustee, was a "statute of repose" setting forth a non-waivable jurisdictional bar to an untimely proceeding rather than a "statute of limitations." The operative language of § 549(d) is almost identical to that of § 546(a).

However, an additional difficulty remains for the Auctioneer's § 549(d) argument here. The date of settlement, at which the realtor in *31–33 Corp.* received the transfer embracing its commissions, was more than two years before the Trustee there filed his motion seeking a turnover of the commissions paid prior to the realtor's appointment as a professional. Here, the settlement of the Debtor's property did not take place until February, 1989. It was not until *that* date that the Auctioneer was entitled to or attempted to exercise dominion over any portion of the $11,000 deposit which he had theretofore held for the Trustee. It was therefore not until *that* date that the disputed transfer of commissions and expenses to the Auctioneer occurred. This motion was filed well within two years from *that* date. Therefore, although the Trustee's motion is necessarily based upon § 549, § 549(d) is not a bar to the instant motion.

The only statement of how the Auctioneer's commissions are to be computed here is contained in the Order of November 5, 1986. Therein, the Auctioneer was hired "to conduct the sale at a rate of compensation of seven (7%) percent, ..." In the absence of any more specific order or agreement on this point, it seems clear that the compensation via commission was keyed to the *sale* of the Debtor's property, not unconsummated *bids* for the sale of same. *See Childs, supra,* 460 A.2d at 1034–36. Certainly, there is no evidence that the general rule that an auctioneer's commission is recoverable on a consummated sale rather than on an unconsummated bid should be altered as to the sale in question. Furthermore, it is not the place of the Auctioneer to question whether the Trustee has properly performed his duties in agreeing to reduce Basen's bid from $73,000 to $65,700.

We therefore conclude that the Order of November 5, 1986, authorizes the Auctioneer to receive a commission measured by seven (7%) percent of $65,700, or $4,599, and not $5,110, as the Auctioneer claims.

With respect to its claim for reimbursement of costs, the Auctioneer had met its burden under *Mayflower Associates* and *Metro Transportation, supra,* of establishing its right to reimbursement for all of the advertising costs claimed, *i.e.,* $2,775.40. Indeed, even the Trustee apparently raises no objection to this demand. Rather, the Trustee reserves his rather excessively bombastic denunciations of the Auctioneer for commentary on its claims of reimbursement for "Labor," secretarial work, and costly "visits" to the premises, itemized at page 638 *supra.*

■ We agree with the Trustee's conclusion, if not his means of expressing same, that the Auctioneer's requests for these sums are both procedurally and substantively defective. Procedurally, the documentation for same is not in conformity with *Mayflower Associates, supra,* or *Metro Transportation, supra,* despite the specific direction that the procedures set forth in *Mayflower Associates* should be complied with in our Order of June 16, 1989. Substantively, the claims for labors and secretarial tasks "epitomize ... the unacceptable efforts" of a professional "to transform traditional overhead expenses, i.e., secretarial time to produce any given document, into a reimbursable expense payable by the estate." *In re Motor*

*Freight Express*, 80 B.R. 44, 47 (Bankr.E. D.Pa.1987). *See also Metro Transportation, supra*, 78 B.R. at 419. The commissions paid to the Auctioneer contemplate a net profit to the Auctioneer after deduction of overhead. The Auctioneer cannot be permitted to expand his profit by charging the estate with his labor costs. Such a practice would be comparable to an attorney's seeking to add his lodestar and the value of his secretary's work to a contingent-fee award. Needless to say, this is impermissible.

We therefore conclude that the Auctioneer is entitled to reimbursement of only $2,775.40 of his requested costs.

■ The final issue raised in the Trustee's motion is a claim for interest, in addition to the $739.46 remitted to him by the Auctioneer. We conclude that the evidence of the dealings between the parties is too scanty to allow any adjustment to the $739.46 sum which the Auctioneer rather mysteriously determined was due to the Trustee and consequently remitted to him on February 21, 1989.[4] There is some attraction to the Trustee's contention that the Auctioneer had the use of $11,000 for two years, and hence should pay interest of at least $1,100 therefor. A debtor-in-possession and its counsel have a fiduciary duty to invest funds which they reasonably should anticipate that they will be holding for any significant length of time. *See In re J & J Record Distributing Corp.*, 80 B.R. 53, 55–56 (Bankr.E.D.Pa.1987), *aff'd*, 84 B.R. 364 (E.D.Pa.1988). The same duty should attach to any fiduciary of a debtor, including the Auctioneer here.

■ However, the record here is unclear as to whether the Auctioneer should have known the length of time that it would be holding the Debtor's funds. We believe that it was quite unusual and totally beyond the expectation of all involved that the hiatus between the auction and the settlement of the sale of the Debtor's property would extend to two years. It is also unclear whether the Trustee provided any directions to the Auctioneer regarding dis-

position of the funds. In the absence of same, the fiduciary duty of the Auctioneer to invest these funds was unclear. Rather than second-guess the Auctioneer without sufficient information to do other than guess at the important surrounding facts, we hold that the remittance of $739.46 on account of interest was adequate.

We therefore conclude that the Auctioneer is entitled to a commission of $4,599.00, plus reimbursement of expenses of $2,775.00, less the $739.46 interest remitted, or net compensation of $6,534.54. It therefore should have remitted $4,465.46 to the Trustee out of the $11,000 deposit held by it. It has already remitted $3,024.06 to the Trustee. It is therefore obliged to turn over an additional $1,441.40 to him.

We would observe that, in allowing the Auctioneer to turn over only the net sum due to the Trustee, rather than the entire balance of the deposit remaining in its hands, as the Trustee requests, we are allowing the Auctioneer to avoid giving all other interested parties the notice to which they are entitled under B.Rule 2002(a)(7) and L.R.Rule 2002.3. We shall therefore direct the Auctioneer to provide that notice now. However, given the rigorous review of the sum sought by the Trustee and this court, we are willing to allow the Auctioneer, in this case but not in the future, to set off its apparent just compensation against the deposit proceeds pending any further reductions in compensation if other objections are successfully raised.

We shall also require the Trustee to give all interested parties notice of his reduction of the bid of $73,000 to the ultimate sale price of the property to $65,700 in order that any objections thereto can be raised by interested parties. We shall also include in our Order a schedule of filings to assure prompt administration of this now dated case to conclusion.

---

4. We can only guess at how this sum was computed. We would guess that this was the interest actually earned on the deposit by the Auctioneer during the period that it remained in his hands.