**In re 222 LIBERTY ASSOCIATES, Debtor.**

**222 LIBERTY ASSOCIATES, Plaintiff,**

**v.**

**PRESCOTT FORBES REAL ESTATE CORP., Defendant.**

**Bankruptcy No. 88–11535S.**
**Adv. No. 89–0674S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 16, 1990.

David R. Dearden, Sprague Higgins Creamer & Sprague, Philadelphia, Pa., for defendant.

Andrew N. Schwartz, Philadelphia, Pa., for creditors' committee.

Stephen B. Mirow, Philadelphia, Pa., for Philip J. Banks.

Laurence J. Kaiser, Kronish, Lieb, Weiner & Hellman, New York City, for Donald L. Wolk.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The parties have litigated this proceeding, concerning an attempt by the Debtor–Landlord to recover $24,531.71, plus interest, from a realtor who set off his commissions against a tenant's deposit, as if it presented a difficult issue of application of 11 U.S.C. § 549(b), an obscure Bankruptcy Code section concerning transfers in the "gap" period between the filing of a bankruptcy petition and the entry of an order for relief. *See In re 222 Liberty Associates*, 94 B.R. 381, 382 (Bankr.E.D.Pa.1988), *rev'd*, 110 B.R. 686 (E.D.Pa.1989) (hereinafter *"Liberty I"*).[1] However, we hold that the Plaintiff–Debtor, 222 LIBERTY ASSOCIATES (hereinafter "the Debtor"), is entitled to judgment on at least two other grounds: (1) The realtor's act was violative of the automatic stay, an issue which we are obliged to raise *sua sponte*; and (2) The realtor, as an escrow agent for the Debtor and its tenant, had no right to apply funds deposited in escrow by the tenant on behalf of the Debtor to the benefit of his own fees.

### B. PROCEDURAL HISTORY

Christopher Kuhn, Silverman, Markovitz, Meo & Raslavich, Philadelphia, Pa., for debtor.

This bankruptcy case was commenced on May 3, 1988, by the filing of an involuntary

1. No Opinion accompanies the one sentence Order which reverses our reported Opinion and accompanying Order.

petition under Chapter 11 of the Bankruptcy Code against the Debtor, a partnership whose sole asset is a nearly-vacant 12-story building in center city Philadelphia. A consensual order for relief was entered on September 28, 1988. Given its moderate size, this case has generated an inordinate amount of litigation and published Opinions, to which any interested reader is referred for a history of the case. In addition to *Liberty I*, addressing a dispute over "gap"-period payments for electric service, published Opinions arising from disputes in this case appear at 99 B.R. 639 (Bankr.E.D. Pa.1989) (concerning a dispute between the Debtor's general partners); 101 B.R. 856 (Bankr.E.D.Pa.1989) (deciding a dispute between the Debtor and an electrical contractor at its property); 105 B.R. 798 (determining the amount of the secured claim of the Debtor's principal secured lender); and what promises to be our longest opus to date, our Opinion of January 4, 1990, 108 B.R. 971, denying confirmation of two separate Plans of Reorganization submitted by one of the Debtor's two general partners.

The instant proceeding, commenced by counsel for the Debtor on July 14, 1989, involves a matter which is removed from the frenetic disputes between the general partners and the contest to determine whether any interested party can produce a confirmable plan, which have spurred most of the above-referenced litigation. The trial was conducted on November 20, 1989. Although an earlier intention to obtain a transcript was withdrawn, the parties requested rather lengthy periods in which to submit proposed Findings of Fact, proposed Conclusions of Law, and Briefs, and then requested and obtained further extensions to January 4, 1990 (the Plaintiff–Debtor) and February 2, 1990 (the Defendant), to make these submissions. The submissions were made in accordance with the latter schedule, but were brief (about 10 pages each) and, unfortunately, transfixed with § 549(b), the application of which to this proceeding we deem relatively insignificant. *See* pages 203–04 *infra*. Since this is an adversary proceeding, we are obliged, by the dictates of Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure 52(a), to submit our decision in the form of Findings of Fact and Conclusions of Law. The latter will include a discussion of the legal principles which we deem pertinent.

## C. FINDINGS OF FACT

1. On or about November of 1987, the Defendant, PRESCOTT FORBES REAL ESTATE CORP. (herein "the Defendant"), by Peter Pakuris, its President (hereinafter "Pakuris"), entered into an oral agreement whereby the Defendant would be an exclusive rental agent of the Debtor's building at 110 South 16th Street, Philadelphia, PA (herein "the Property"), with Philip J. Banks (hereinafter "Banks"), then the managing partner of the Debtor.

2. On or about June 4, 1988, the Defendant, apparently unaware of the involuntary Chapter 11 filing against the Debtor about a month prior thereto, and without obtaining any appointment by this court as a professional, submitted to the Debtor a signed lease with a tenant (Integra) for a portion of the Property, which the Debtor accepted. The Debtor belatedly paid to the Defendant $2,199.36, representing the brokerage commission due for the Integra lease based upon a "discounted commission" formula computed on the aggregate rates payable under the lease, *i.e.*, six (6%) percent of the first year's rentals, five (5%) percent of the second, four (4%) percent of the third, and three (3%) percent of all subsequent years' rentals.

3. On July 1, 1988, the Debtor and the Defendant executed a written Agency Agreement (hereinafter "the Agreement"), including an exclusive leasing commission agreement similar to the earlier oral agreement, the main difference being that the new commission agreement deleted the reference to the five (5%) percent commission in year two. The Agreement also included the following provision:

> Owner [the Debtor] agrees that deposit monies will be retained by agent [the Defendant] in an escrow account in accordance with Pennsylvania statutes until consummation or termination of any

lease that may occur as a result of this agency.

4. On July 20, 1988, pursuant to the Agreement, the Defendant submitted to the Debtor a signed lease with Sung Won Suh (hereafter "Suh") for a restaurant in the street floor of the Property, which the Debtor accepted.

5. Pursuant to the Lease, on or about July 25, 1988, Suh paid the sum of $26,-666.66 to the Defendant, which represented the first month's rent in the amount of $6,666.66, and a security deposit of $20,-000.00.

6. On July 22, 1988, being concerned that the Debtor would delay in paying the Defendant its commissions, as it had in the case of the Integra lease, Pakuris wrote to Banks, advising that he had deposited Suh's check for $26,666.66 in escrow pursuant to the Agreement and proposing that he be permitted to deduct the commissions payable to the Defendant for generating that lease, initially said to be $25,161.71, from Suh's check and forward the Debtor the net balance.

7. In response to this letter, Banks wrote to Pakuris by a letter dated July 25, 1988, in which Banks questioned Pukuris' calculation of the commissions, and indicated that he believed that it was the Defendant's responsibility to remit Suh's payment to the Debtor, irrespective of whether the Defendant's commissions had been paid.

8. By a letter also dated July 25, 1988, Pakuris responded to Banks' above-referenced letter, stating that he had recalculated his commissions at $24,531.71, and agreeing to remit Suh's funds by exchanging the Defendant's certified check for this sum with a certified check from the Debtor for the commissions.

9. Having apparently not received a favorable response to this offer to exchange certified checks, the Defendant proceeded to simply remit a check dated July 28, 1988, to the Debtor for the difference between Suh's deposit and the commissions, a net sum of $2,134.95. In response, by letter of July 29, 1988, Banks severed his relationship with the Defendant.

10. Pakuris admitted, in questioning from the court, that his actions in taking his commissions out of Suh's payments which he held in escrow were not "proper" and that this was the only instance, in thirteen years of doing business, that he had ever done such a thing.

11. The Defendant claimed to have spent approximately 800 hours on the Debtor's behalf in attempting to rent up the Property between March and July, 1988, with a greater portion of the activity in May, June and July, 1988.

12. On or about January 15, 1989, Suh terminated the lease and vacated the Premises. However, he ultimately assigned the lease to another restaurant owner, who presently remains as one of the Debtor's few tenants.

13. At no time did the Defendant ever seek to be appointed as a professional person hired by the Debtor nor did it ever file a motion to obtain relief from the automatic stay arising from the filing of the involuntary petition against the Debtor.

D. CONCLUSIONS OF LAW/DISCUSSION

1. *The Instant Proceeding Is Core and Therefore We Can Determine It.*

The parties agree that this matter is a core proceeding over which this court not only has jurisdiction, but is empowered to decide, pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(E), (b)(2)(O).

We also agree. This proceeding involves an attempt to recover certain specific funds, which the Debtor, we believe appropriately, alleges should have been held for it by the Defendant in escrow. We believe that the automatic stay is implicated. The proceeding is therefore comparable to that found by us to be core in *In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 572 (Bankr.E.D.Pa.1988). *See* 28 U.S.C. § 157(b)(2)(A) and (b)(2)(G). It is also a proceeding to collect an account receivable in which the cause of action arose post-petition. *See In re Arnold Print Works,* 815 F.2d 165, 168–71 (1st Cir.1987); *Valley Forge Plaza Associates v. Firemen's Fund Insurance Cos.,* 107 B.R. 514, 516–18 (E.D. Pa.1989); and *In re Jackson,* 90 B.R. 126,

129–30 (Bankr.E.D.Pa.1988). Therefore, it is indeed core, and we may determine it.

2. *The Defendant's Post–Petition Set-off of its Claim For Commissions Against the Debtor's Right to its Tenant's Payment and Deposit, Without First Obtaining Relief From the Stay, is Void, and, Therefore, on This Basis Alone, the Debtor is Entitled to Prevail in This Proceeding.*

■ The Defendant's action by which it obtained possession of the $24,531.71 sum in issue can be characterized as an attempt of the Defendant to set off its claim of commissions due from the Debtor against the Debtor's claim against it for receipt of Suh's payment. In an involuntary bankruptcy case, filed "under section ... 303 of" the Bankruptcy Code, as in a voluntary case, the filing of the petition itself gives rise to the automatic stay. 11 U.S.C. § 362(a). *See* 2 COLLIER ON BANKRUPTCY, ¶¶ 303.16[1], 362.03, 362.11, at 303–81, 362–31, 362–73 (15th ed. 1989).

The sums paid to the Defendant by Suh for rent and the security deposit were clearly property of the Debtor's estate. *See, e.g., Carlton House, supra,* 93 B.R. at 865–67; and *In re Mason,* 69 B.R. 876, 883–84 (Bankr.E.D.Pa.1987). The automatic stay prevents, *inter alia,* "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). It also specifically prevents "the setoff of any debt owing to the debtor that arose before the commencement of the case ... against any claim against the debtor." 11 U.S.C. § 362(a)(7).

An argument could be made that § 362(a)(7) does not apply here because the obligation of the Defendant to the Debtor and the Defendant's claim against the Debtor both arose post-petition, on July 20, 1988, and July 25, 1988, respectively, the dates that Suh executed the lease and made his payments to the Debtor, respectively. "The courts are divided on whether [mutual post-petition obligations] may be set off." 4 COLLIER, *supra,* ¶ 553.08[1], at 553–44. However, 11 U.S.C. § 362(a)(3) is not limited in its application to prepetition

claims or events. Therefore, even if we conclude that § 362(a)(7) is inapplicable, the automatic stay arises by reason of § 362(a)(3).

The Defendant's failure to obtain relief from the automatic stay before proceeding in a manner violative of either § 362(a)(3), or § 362(a)(7), or both, renders its actions violative of the stay. *See In re Orient River Investments, Inc.,* 105 B.R. 790, 797 (Bankr.E.D.Pa.1989); *In re New York City Shoes,* 78 B.R. 426, 432 (Bankr.E.D.Pa. 1987); and *In re Lessig Construction, Inc.,* 67 B.R. 436, 443–44 (Bankr.E.D.Pa.1986). An action taken by a creditor in violation of the automatic stay is void, irrespective of the creditor's lack of knowledge of the bankruptcy filing and, hence, the existence of the stay. *See, e.g., In re Ward,* 837 F.2d 124, 125–26 (3d Cir.1988); *In re Boston Business Machines,* 87 B.R. 867, 870 (Bankr.E.D.Pa.1988); and *In re Clark,* 69 B.R. 885, 889–90, *modified,* 71 B.R. 747 (Bankr.E.D.Pa.1987).

Therefore, the Defendant's act of setting off its $24,531.71 indebtedness against the funds of the Debtor in its possession was violative of the automatic stay and, for that reason, void. This conclusion is, in itself, sufficient to carrying the day for the Debtor.

■ We recognize that the Debtor did not raise the issue of the application of the automatic stay as a basis for relief, either at trial or even in its post-trial briefing. However, a court is obliged to raise the issue of the application of the automatic stay *sua sponte. Association of St. Croix Condominium Owners v. St. Croix Hotel,* 682 F.2d 446, 447–48 (3d Cir.1982); and *Clark, supra,* 69 B.R. at 889. Therefore, the presence and application of the automatic stay alone requires that we enter judgment for the Debtor.

3. *Irrespective of the Presence of the Automatic Stay, the Defendant, as the Depositary of Funds Held in Escrow, Had no Right to Collect its Own Commissions Out of the Funds.*

Although the Debtor is entitled to judgment solely on the ground that the Defen-

dant's setoff of its commissions against the funds held by it in escrow violated the automatic stay, the rights of the Debtor are heightened by the fact that, even had the Debtor not been in bankruptcy, and no automatic-stay issue was presented, the Defendant's act of setoff would have been impermissible.

It is clear that, under the paragraph of the Agreement quoted at Finding of Fact 3, pages 198–99 *supra,* that the Defendant was obliged to hold deposit monies paid to it by tenants acquired by it for the Debtor, such as Suh, "in an escrow account in accordance with Pennsylvania statutes until consummation or termination of any lease."

An escrow is

a written instrument which by its terms imports a legal obligation and which is deposited by the grantor, promisor, or obligor, or his agent with a stranger or third party, to be kept by the depositary until the performance of a condition or the happening of a certain event, and then to be delivered over to the grantee, promisee, or obligee.

28 AM.JUR.2d 3 (1966). *See also Paul v. Kennedy,* 376 Pa. 312, 315, 102 A.2d 158, 159 (1954); and *Angelcyk v. Angelcyk,* 367 Pa. 381, 384, 80 A.2d 753, 756 (1951). As is stated in *Samango v. Pileggi,* 363 Pa.Super. 423, 432, 526 A.2d 417, 421 (1987),

[t]he depositary under an escrow agreement is generally considered to be the agent of both parties, and the agent's authority must be strictly construed. *Paul v. Kennedy,* 376 Pa. 312, 102 A.2d 158 (1954).

*Accord, Zweifach v. Scranton Lace Co.,* 156 F.Supp. 384, 393 (M.D.Pa.1957); *Kreuer v. Union National Bank,* 276 Pa. 201, 206, 119 A. 921, 922 (1923); and 28 AM.JUR.2d, *supra,* at 18. A depositary's duties have also been likened to that of "the trustee of an express trust with duties to perform for each of the parties." *Id.* at 19. *Accord, Kreuer, supra,* 276 Pa. at 205, 119 A. at 922.

■ If the depositary fails to meet the strict terms of his responsibilities under an escrow agreement, it is "under the implied obligation to indemnify the principal from all unauthorized acts committed under color of the agency." *Id. Accord, Paul, supra,* 376 Pa. at 316–17, 102 A.2d at 160; *Samango, supra,* 363 Pa.Super. at 432, 526 A.2d at 421–22; *Rykaczewski v. Kerry Homes, Inc.,* 192 Pa.Super. 461, 464–65, 161 A.2d 924, 926 (1960); and 28 AM. JUR.2d at 24–28. A breach of the duty to deliver the escrowed property in the manner described in the agreement has been termed a conversion of the property not delivered. *Id.* at 27.

■ In the instant factual matrix, the Defendant was the depositary for funds deposited by Suh for the benefit of the Debtor. The Defendant was obliged, in accordance with "Pennsylvania statutes," which we take to be a reference to the foregoing Pennsylvania common law of escrows, to hold those deposits for Suh and the Debtor until it was required to deliver same to the Debtor at the consummation or termination of Suh's lease. Nevertheless, the Defendant breached its fiduciary duties as a depositary by promptly delivering most of the proceeds of the escrow to itself, for its own commissions. This was done over the vigorous protests of Banks, on behalf of the Debtor, and it resulted in prompt severance of the parties' relationship. Banks' expression of outrage and the sense of Pakuris that this conduct was not "proper" were accurate. The Defendant was guilty of conversion of the funds, and therefore cannot be permitted by this court to retain them.

We have located only one Pennsylvania case in which a depositary, like the Defendant here, was so bold as to attempt to apply funds held by it in escrow for third parties against his own professional fees, *Nell v. McCrea,* 16 D. & C.2d 555, 566–70 (Cumberland Co. C.P.1958). Holding that the depositary, an attorney claiming his fees out of an escrow fund, improperly "departed from the role of being the agent of both parties," *id.* at 567, the court denied all costs and counsel fees to the attorney because it held that his actions constituted a conflict of interests. *Id.* at 568–69. Similarly, here, the Defendant must not only be directed to return the escrowed

funds which it improperly retained, but, by its actions, it may have placed itself into a position where its rights to compensation may be forfeited. *Cf. In re Direct Satellite Communications, Inc.*, 96 B.R. 507, 522–25 (Bankr.E.D.Pa.1989); *In re New York City Shoes*, 89 B.R. 479, 484 (Bankr. E.D.Pa.1988); and *In re Greater Pottstown Community Church of the Evangelical Congregational Church*, 80 B.R. 706, 712 (Bankr.E.D.Pa.1987).

The conclusion that the Defendant is not entitled to the setoff which it effected under applicable state law would be, in itself, sufficient grounds for awarding judgment in favor of the Debtor.

In light of this conclusion, it is certain that relief from the automatic stay would not have been granted to the Defendant to assert its right of setoff against the Debtor even had the Defendant, as was necessary, requested such relief. The right of setoff of creditors against debtors in bankruptcy generally is restricted by the terms of 11 U.S.C. § 553(a). *See In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215–16 (E.D.Pa.1987); *Lessig Construction, supra*, 67 B.R. at 440–43. In order for setoff to be permissible under § 553(a), the debts which are set off must both have arisen pre-petition and the debts must be mutual. *Windsor Communications, supra*, 79 B.R. at 215–17; and *Lessig Construction, supra*, 67 B.R. at 441–43.

Since the Code does not specifically address the issue, there is some question as to whether setoff can ever be employed as to post-petition obligations, even if they are mutual. *See, e.g., In re Sechuan City, Inc.*, 96 B.R. 37, 44–45 (Bankr.E.D.Pa. 1989); and 4 COLLIER, *supra*, ¶ 553.08[1], at 553–44. On one hand, allowing setoff in any context permits the offsetting creditor to obtain a preference against other creditors "simply because the debtor also fortuitously happens to have a claim against the creditor, ..." *Lessig Construction, supra*, 67 B.R. at 441, which is contrary to the fundamental bankruptcy principle that the Debtor's estate be distributed in strict accordance with the priorities of the Bankruptcy Code. *See also Diversa–Graphics,*

*Inc. v. Management & Technical Service Co.*, 561 F.2d 725, 727–28 (8th Cir.1977); and *In re Buckley & Associates Insurance, Inc.*, 78 B.R. 155, 158 (E.D.Tenn. 1987). Other courts have held that, if the post-petition debts are mutual and setoff would otherwise be permissible under state law, setoff is allowed. *See, e.g., In re Mohawk Industries, Inc.*, 82 B.R. 174, 178–79 (Bankr.D.Mass.1987); *In re Fordson Engineering Corp.*, 25 B.R. 506, 510–12 (Bankr.E.D.Mich.1982); and *In re J.A.G., Inc.*, 7 B.R. 624, 628–29 (Bankr.D.Mass. 1980).

By implication, it is clear that a creditor will not be permitted to set off post-petition obligations if they are not mutual. *See Sechuan City, supra*, 96 B.R. at 44–45. When the setoff accomplished by a creditor constitutes a conversion, mutuality of obligation is quite clearly absent. *See Windsor Communications, supra*, 79 B.R. at 216–17.

Therefore, it is inconceivable that the Defendant could have obtained relief from the stay to effect its improper attempt to set off post-petition obligations which were not mutual obligations in a manner contrary to applicable state law. It is clear that, on this independent basis, the Debtor is entitled to recover the funds wrongfully set off by the Defendant.

4. *The Facts That (1) the Defendant is a Professional Person Who Exacted Compensation Without Having Been Appointed and Authorized to Receive Payment From the Debtor's Estate by the Court; and (2) the Transfer in Issue Was Post–Petition are Additional Factors in Favor of the Debtor's Cause of Action.*

We have already held that the Debtor is entitled to the recovery which it seeks against the Defendant on two independent grounds. It may constitute some measure of overkill for us to consider any further alternative grounds on which the Debtor is entitled to recovery.

■ However, other grounds do exist. The Defendant's retention of the $24,531.71 sum in issue constitutes its receipt·of com-

pensation as a professional person without court appointment or approval. A realtor is a professional person, subject to the dictates of 11 U.S.C. §§ 327 and 330. *See In re 31–33 Corp.*, 100 B.R. 744, 746 (Bankr.E. D.Pa.1989). As such, the Defendant-realtor's appointment was required before the services for which compensation is sought was provided. *Id. Nunc pro tunc* appointment is permissible only in extremely limited circumstances. *See, e.g., In re F/S Airlease v. Simon*, 844 F.2d 99, 105–08 (3d Cir.1988); *In re Arkansas Co.*, 798 F.2d 645, 648–51 (3d Cir.1986); and *31–33 Corp., supra*, 100 B.R. at 747. Here, moreover, *nunc pro tunc* appointment as the Debtor's professional has never been sought by the Defendant. Furthermore, due to the Defendant's conflicts of interest in retaining the funds escrowed, such appointment, if sought, would probably never have been permitted. *See* 11 U.S.C. § 327(a) and the cases cited at page 13 *supra* (a conflict of interest prevents appointment of or receipt of compensation by a professional).

Furthermore, a professional person must generally file a detailed application to obtain payment of compensation for services and reimbursement of expenses, and provide notice and an opportunity to object to all interested parties of the application, before receiving payment from the Debtor's estate. *See, e.g., In re Meade Land & Development Co., Inc.*, 527 F.2d 280, 283–84 (3d Cir.1975) (professional must provide a detailed fee application); *In re Schwemmer Hardware Co.*, 103 B.R. 635, 639–40 (Bankr.E.D.Pa.1989) (professionals, like the Defendant here, whose compensation is based upon a commission or contingent fee are required to submit an application, albeit one providing somewhat less detail than professionals compensated on an hourly basis); and *In re Mayflower Associates*, 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987) (detail required for reimbursement of costs spelled out).

The Defendant has neither requested appointment as a professional, nor been appointed in this stead, nor filed an application seeking compensation for services and reimbursement for expenses in any form. Moreover, unlike most professionals employed by a debtor in a bankruptcy case, his receipt and even his entitlement to compensation were opposed by the Debtor. Compensation was received only through the means of improper conversion of the escrow account which was conveniently in its possession.

There is, however, one consideration which runs in the Defendant's favor on this point. During the "gap" period between the filing of an involuntary petition and the entry of an order for relief, "the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303(f). Arguably, this provision permits the debtor to make payment "for essential services and professional services including retention of counsel" during the "gap" period without obtaining court approval or appointment of professionals employed on its behalf. 2 COLLIER, *supra,* ¶ 303.35[1], at 303–117. *See In re Sun Spec Industries, Inc.*, 3 B.R. 703, 705 (Bankr.S.D.N.Y.1980). However, § 303(f) is based upon the premise that the debtor should not be disrupted in carrying on its business and defending against the involuntary petition itself if it wishes to do so during the "gap" period. Allowing a professional to involuntarily extract compensation from a debtor during this period is hardly within the scope of activities which § 303(f) was drafted to protect.

■ Also worthy of at least some consideration is the sole issue raised by the Debtor in its Complaint, *i.e.,* that the retention of the $24,531.71 by the Defendant was an impermissible post-petition transfer, avoidable under 11 U.S.C. § 549. Unauthorized payments to professionals are recoverable under § 549. *See 31–33 Corp., supra,* 100 B.R. at 747–48. Our collection of virtually all of the cases construing § 549 caused us to conclude, in *Liberty I, supra,* 94 B.R. at 384–85, that post-petition transfers are generally avoidable and that the exceptions thereto set forth in §§ 549(b) and (c) must be narrowly construed. *Accord, Ward, supra,* 837 F.2d at 126–27; 4 COLLIER, *supra,* ¶ 549.02, at 549–6.

The Defendant relies upon § 549(b) as the basis for permitting it to retain the sums transferred, arguing that it met its burden of proving that it performed services between the commencement of the "gap" period on May 8, 1989, and the abrupt termination of its services on July 29, 1988, which were at least equal in value to the payment received. *See* B.Rule 6001; and Finding of Fact 11, page 199 *supra.* The main authority cited by the Defendant in support of its defense is *In re Walter's Disposal Service, Inc.,* 73 B.R. 6 (Bankr.W. D.Mo.1987), in which the court declined to allow avoidance of a voluntary "gap" payment made by the debtor to secure performance of a post-petition waste disposal contract.

We question whether the Defendant met its heavy burden under § 549(b), which the cases collected by us in *Liberty I,* 94 B.R. at 384–85, have held was not met in circumstances substantially more compelling than those here. We also question whether the totally voluntary payment, made by the debtor in *Walter's Disposal Service* in furtherance of a contract on which the debtor sought to renege, is comparable to the instant totally involuntary payment extracted by the Defendant from the Debtor.

However, in no event can § 549(b) be read to allow an unappointed professional to retain funds which were seized from a debtor in compensation for services in violation of both the automatic stay arising from the Bankruptcy Code and applicable state law. Rather, § 549(b) allows to certain transferees, entitled to payments under state law and not otherwise barred from receipt of payments by the Bankruptcy Code, a narrowly-construed dispensation from the otherwise pervasive ban on post-petition transfers. Thus, § 549(b) is of no help to the Defendant here.

5. *The Debtor is Entitled to Pre–Judgment Interest From July 28, 1988, to the Date That the Defendant Remits Repayment to it.*

Pennsylvania law commands that prejudgment interest at the statutory rate of six (6%) percent per annum, 41 P.S.

§ 202, must be added as an element of damages when a liability with a fixed, ascertainable value has gone unpaid. *See, e.g., Benefit Trust Life Insurance Co. v. Union National Bank,* 776 F.2d 1174, 1178–79 (3d Cir.1985); *In re University Medical Center,* 93 B.R. 412, 417 (Bankr.E. D.Pa.1988); *Lessig Construction, supra,* 67 B.R. at 444–45; *Penneys v. Pennsylvania R.R.,* 408 Pa. 276, 279–81, 183 A.2d 544, 546 (1962); and *Verner v. Shaffer,* 347 Pa.Super. 206, 211, 500 A.2d 479, 482 (1985). *Cf. Windsor Communications, supra,* 79 B.R. at 217–18 (interest payable as an element of damages in a matter in which there has been a conversion of property is measured at the market rate, not at the lower statutory rate).

The Defendant's liability of $24,531.71 has been fixed since July 28, 1988, when it improperly seized the funds in issue. The Debtor will therefore be awarded interest at the statutory rate from that date until the date of this judgment and, thereafter, interest measured at the rate fixed by 28 U.S.C. § 1961. *See, e.g., In re New York City Shoes, Inc.,* 98 B.R. 725, 731 (Bankr.E. D.Pa.), *aff'd,* 106 B.R. 58 (E.D.Pa.1989).

### ORDER

AND NOW, this 16th day of February, 1990, after a trial of the above-entitled proceeding on November 20, 1989, and upon consideration of the post-trial submissions of the parties, it is

ORDERED AND DECREED that judgment is entered in favor of the Plaintiff–Debtor, 222 LIBERTY ASSOCIATES, and against the Defendant, PRESCOTT FORBES REAL ESTATE CORP, in the amount of $24,531.71, plus interest at six (6%) percent per annum from July 28, 1988, to the date of this Order, and at the rate established at 28 U.S.C. § 1961 thereafter until payment is made.